[Crim. No. 4068. In Bank.—October 5, 1939.]

THE PEOPLE, Respondent, v. MAJOR RAYMOND LISENBA, Appellant.

William J. Clark, Morris Lavine, R. E. Parsons and Samuel L. Rummel for Appellant.

U. S. Webb, Attorney-General, Earl Warren, Attorney-General, Warner I. Praul, Deputy Attorney-General, Buron Fitts, District Attorney, Eugene D. Williams, Chief Deputy District Attorney, and John Barnes, Deputy District Attorney, for Respondent.

THE COURT.—This cause is before this court on rehearing. In the former opinion (*People* v. *Lisenba*, (Cal.) 89 Pac. (2d) 39) every point then raised by appellant was discussed. On further consideration of this appeal, we are of the opinion that the proper conclusions were reached in said former opinion on all points then raised. We therefore adopt said opinion as a part of this opinion upon rehearing. Said former opinion follows:

"In an indictment returned by the grand jury of Los Angeles county, Major Raymond Lisenba (also known as Robert S. James and who will be referred to as the defendant), and one Charles H. Hope were jointly charged with the murder of Mary Emma James, defendant's wife. The alleged homicide was perpetrated on or about August 5, 1935, and remained undetected for a period of several months. In fact, the indictment was not returned until May 6, 1936. Thereafter, the accomplice Hope entered a plea of guilty to the charge and at the time of defendant's trial was awaiting sentence. He has been since sentenced to life imprisonment. Hope was the principal witness for the prosecution upon the defendant's trial, at which trial it was the theory of the People that defendant, in league with Hope, had plotted and consummated the death of defendant's wife for the purpose of collecting and dividing the proceeds of certain insurance policies on her life. It was also the theory of the prosecution that the homicide was perpetrated in such manner as to give the appearance of accidental death not only to allay suspicion but in order to bring into operation the double indemnity provisions of the insurance policies. In this connection, the evidence of the prosecution tends to establish that the conspirators undertook to bring about the deceased's death by means of a deliberately inflicted poisonous rattlesnake bite on the under side of deceased's left foot (the assumption probably being that, if fatal, such bite or laceration would appear to have been incurred in or about

the garden of her home) and that this ingenious method of destruction having proved ineffective the conspirators accomplished their objective by deliberately drowning the deceased in the bathtub of her home, whereupon her body was placed in the fish pond on the premises to further the 'accidental' appearance of her demise. The methods assertedly employed to bring about the deceased's untimely death will hereinafter be more fully described upon a detailed recitation of certain of the evidence. Upon the conclusion of defendant's trial, a verdict was returned finding him guilty of murder in the first degree, without recommendation. This appeal is from the judgment imposing the extreme penalty and from the order denying a new trial. We turn now to a discussion of pertinent evidence in the case.

"Viola and James Pemberton, husband and wife, when called by the prosecution, testified, in substance, that they had accompanied the defendant to his home on the evening of August 5, 1935, where they were to take dinner with the deceased and defendant; that upon arrival there they failed to find the decedent in the house whereupon defendant procured flashlights and suggested a search of the grounds and garden; that the defendant went to the back and James Pemberton to the front of the premises; that as the witness James Pemberton walked back through the shrubbery he saw the body of the deceased in and near the fish pond, with the upper part of the body and head (face down) submerged in the water; and that when the defendant was told of the gruesome discovery he cried and otherwise expressed his grief.

"John P. Toohey, a deputy sheriff, testified that he, in company with another deputy and in response to a summons, appeared at the scene at approximately 8:30 p. m., at which time he saw the body of the deceased near the fish pond; that at the time the head was in the water, face up (the discoverers undoubtedly having previously moved it); that the water was approximately 14 inches in depth; and that the body was so placed that he could see that the left leg 'was swelled and very blue'.

"A. L. Hutchinson, also a deputy sheriff, testified that when he arrived at the scene he 'noticed a cut on her [deceased's] left toe, her big toe on the left foot'; that the flesh of her left leg 'was very dark . . . and it was almost

black between the ankle and the knee, very black'; that the 'whole [left] leg was black and blue from the ankle up to the knee and on the inside of the leg' and was 'some swollen'.

"Charles H. Hope, the defendant's confessed accomplice and who at the time was awaiting sentence upon his plea of guilty to the charge of murder, testified, as the state's principal witness, that he had known the defendant for approximately seven years; that when conversing with the defendant in the latter's barber shop in June, 1935, the defendant asked him if he had any knowledge of rattlesnakes, to which the witness answered in the negative; that the defendant thereupon stated that he had a friend who had a wife he wanted to kill and desired rattlesnakes for the purpose, adding that if he (Hope) would 'get me some rattlesnakes, I will give you $100' and 'defray all expenses'; that subsequently he (Hope) bought three rattlesnakes in Long Beach and delivered them a few evenings later to the defendant at his home; that the snakes cost $5 but the defendant paid him $20 prior to their delivery; that the defendant then had him stay at his (defendant's) home for several days and while there had the witness go to town and have two boxes made for the snakes with sliding glass tops; that the boxes were approximately two feet long and nine inches high; that in July, 1935, he again talked with the defendant at his barber shop at which time the defendant said his friend was dissatisfied with the snakes because they were not fighters and that fighters could be procured at the Ocean Park Snake Pit; that thereafter he went with the defendant to said snake pit where the defendant conversed with the attendant and said 'that is the one I want'; that the following day the defendant sent him to purchase the snake so designated; that the purchase was made and the snake was delivered to the defendant; that he next saw the defendant on August 3, 1935, two days prior to the homicide, at which time the defendant said that the snake was no good and that he wanted some fighters; that he (the witness) thereupon went to 'Snake Joe' at Pasadena and purchased two snakes which he delivered to the defendant; that the defendant said 'his wife [the deceased] had $5000 worth of insurance and he was going to collect it'; that he went to the defendant's home on August 4, 1935, the day preceding the homicide, at which time the defendant stated that the witness was in as deep

as the defendant; that defendant had him bring one of the sliding glass top boxes containing a snake from the garage into the house; that he came in the back way to the kitchen at which time he observed the deceased in her nightgown strapped or tied to the kitchen table and with adhesive tape, previously purchased by the witness at the defendant's request, fastened over her eyes and mouth; that the defendant told him he got the deceased, who was then pregnant, on the table under a ruse that a doctor was coming to 'perform some kind of an operation on her for pregnancy'; that while the deceased remained in this prostrate position the defendant put her left foot into the box containing the snake; that the witness then returned the box to the garage; that he later left in the defendant's car with the box containing the snakes and dead chickens, etc., which had fallen prey to the snakes in defendant's prior tests of their ability to destroy; that he then picked up his (the witness') wife at her place of employment and returned the snakes to 'Snake Joe' from whom they had been procured; that he threw the boxes out along the road; that he returned to the defendant's home about 1:30 a. m., August 5, 1935, the day of the homicide; that the defendant then appeared to have been drinking and told the witness that the snakes were no good and that his wife was not even sick; that the defendant thereupon jumped up and said, 'I am going in and drown her'; that the witness stayed in the automobile; that the defendant came out about 4:00 a. m. and said, 'That is that'; that at approximately 6:30 or 7:00 a. m., the defendant said the deceased had been dead since 4:00 a. m. and the house 'cleaned up'; that defendant then asked him to 'help me carry it' whereupon he accompanied the defendant into the house where he observed the deceased lying in the hall dead with her feet toward the bathroom; that the defendant took the upper part of deceased's body and the witness the lower part and carried her 'towards the fish pond'; that the witness refused to put deceased in the fish pond as requested by the defendant but went instead to the automobile; that the defendant told him he would care for him 'when I get this money'; and that some time later the defendant gave him $100 and instructed him to 'get out of town'. The witness thereupon identified three persons in the courtroom as the three men from whom on separate occasions he had purchased the

snakes as above mentioned. His story was not materially shaken on cross-examination.

"Certain portions of Hope's testimony were corroborated by his wife who, among other things, testified that on August 3, 1935, she drove with Hope to a snake farm in Pasadena; that Hope took a box and went to the side of the barn where she saw him with 'Snake Joe', whom she identified when he arose in court; that the following morning she drove with Hope to within a block of defendant's home and Hope left her there, the witness driving back to Los Angeles alone; that Hope picked her up at work about 2:00 p. m. of that day (August 4th) in the defendant's car; that there were boxes in the back of the car; that they again drove out to the snake farm in Pasadena; that Hope took a box and went inside, returning several minutes later with 'Snake Joe'; that on the return trip Hope threw out two boxes with glass tops; that Hope left her after dinner and she did not see him again until the following morning (the morning of the homicide) when he appeared 'white and jittery and had been drinking'.

"Additional corroboration of portions of Hope's story appears in the testimony of the three persons from whom he assertedly purchased the several snakes. Roland H. Kirby testified that early in July, 1935, Hope came to him and said he was interested in experimental work and inquired if he had snakes 'with fangs and poison'; that Hope purchased three snakes and the witness gave him a jar of crystallized rattlesnake venom.

"Mike Allman, who operated a reptile show at Long Beach, testified that the defendant and Hope one day came to his snake pit; that they had been drinking and were noisy; that the defendant offered to bet that the witness had no poisonous snakes; that the following day Hope returned with a sliding glass top box and purchased a rattlesnake, stating that he had lost $100 to the defendant in a poker game and the defendant had offered to bet him $50 that the witness had no poisonous snakes; and that upon being assured that a certain snake was poisonous, Hope purchased it to recoup a part of his card loss to the defendant. On redirect examination the witness stated that some time later and after their arrest, he had identified and picked out the defendant and Hope from a crowd of persons.

"Joe Houtenbrink, known as 'Snake Joe', testified that he operated a snake farm in Pasadena; that Hope came there on August 3, 1935 (two days prior to the homicide) and purchased two Diamond Back or Crotalus Atrox rattlesnakes for which he paid $3.00; that Hope said he had a friend and 'he said he already bought some snakes from other places and they wasn't hot and he wanted a real hot one and he was told to come over to me to get the snakes, that I handled hot snakes'; that Hope explained he wanted the snakes to bite and kill a dog and thus win a bet; that Hope had a box with a glass cover or top for the snakes; that he saw Hope the following day about 3:00 p. m. (the day preceding the homicide) and that at that time he repurchased the snakes from him for half price. This testimony corroborates that of Hope and his wife.

"At this point in the trial argument arose between counsel over the prosecution's proposal to bring into court the two snakes purchased by Hope from the preceding witness and which the district attorney declared were 'the actual snakes that were at the house that day'. Defense counsel vigorously opposed their production in court but the objection was overruled. The two snakes were thereupon produced in court confined in boxes. Defense counsel then insisted that the record show that the courtroom was assertedly thrown into a state of excitement and consternation by the production of the two snakes. However, in opposition to counsel's assertion, the record also discloses the statement of the trial judge that the decorum of the courtroom and the orderly conduct of the trial were not disturbed in any manner by the incident. Thereupon, 'Snake Joe', still on the stand, identified the two snakes so produced as the two he had sold to Hope two days prior to deceased's death and had repurchased from him one day prior thereto. According to Hope's testimony, at least one of the two snakes so identified, was employed by defendant and him to inflict a poisonous bite on the deceased's left foot when it was pushed by the defendant into the box containing the reptile. In view of such identification of the snakes and their employment in the plan to bring about the death of deceased, we perceive no error in the trial court's ruling permitting the production of the snakes for the inspection of the jury. It is not uncommon upon a murder trial to offer in evidence as

part of the *res gestae* the medium employed to bring about the violent or untimely death of the victim. In *People* v. *Bannon,* 59 Cal. App. 50, 56 [209 Pac. 1029], it is stated that 'As a general rule physical objects which constitute a part of the transaction, or which serve to unfold or explain it, may be exhibited in evidence, if properly identified, whenever the transaction is under judicial investigation.' (See, also, *People* v. *Peete,* 54 Cal. App. 333, 348 [202 Pac. 51], and 8 Cal. Jur. 143, sec. 228.) Moreover, the production of the identical snakes tended to corroborate the testimony of prosecution witnesses and to otherwise support the case of the People. It might also be mentioned that if the production of the snakes in court caused the extreme state of excitation urged by the defense, it is difficult to appreciate why defense counsel at a later time in the trial and during the development of the case by the defense, again produced the snakes and thus risked a repetition of the situation of which complaint is here made.

"Returning to our discussion of the evidence, we find that the witness Irving Sherman, called by the People, testified to the effect that his father was in the cabinet business and that Hope on July 28, 1935 (several days prior to the homicide) ordered and had made two boxes with sliding glass tops. This item of evidence lends some credence to portions of Hope's testimony as well as to that of other prosecution witnesses.

"In support of Hope's testimony that he was with the defendant at his shop and at his home several times prior to the homicide, thus affording opportunity for the planning and carrying out of their scheme, there is the testimony of Lois Wright, the defendant's niece, that she had seen Hope at defendant's barber shop, where she worked, and also had seen him in July, 1935, at defendant's home.

"Sam Grant, a barber in defendant's shop, also placed Hope there on many occasions in 1935.

"Dr. A. F. Wagner, the autopsy surgeon, testified that he found a laceration on the surface of deceased's great left toe; that her left foot was considerably swollen and discolored, the swelling extending up to the hip; and that deceased's lungs contained a considerable amount of water. He gave as the cause of death, 'drowning and an acute cellulitis [swelling] of the legs.' Cellulitis, he testified, is 'always due

to an infection of some kind'; that cellulitis resulting from a bacterial infection would take from two or three days to a week to reach the extent it had in the deceased but that if caused by 'animal poisons' it would progress 'much faster'. He elaborated to the extent of saying that animal poisons capable of producing cellulitis such as the deceased had would be 'the venoms of insects and snakes, spiders, and so forth'. He further testified that the cellulitis present in deceased was not of the bacteriological type but was of the 'animal poison' type and 'could have been' caused by the bite of a snake. In addition, he testified that he again had examined the deceased's body in May, 1936, following its disinterment when criminal proceedings appeared in order, and that he was of the opinion that the laceration on the deceased's toe was caused by a rattlesnake bite.

"Dr. Gustave Boehme, who was present at the examination following deceased's disinterment, testified that he had made a special study of snakes and snakebites; that on deceased's great toe of the left foot he had discovered an 'old laceration wound approximately a quarter of an inch in length' which could have been caused by a number of things but, in his opinion, had been caused 'by some venomous creature, probably a snake, and all the other findings on the leg were compatible with such a finding', adding that the single incision was such 'as could be caused by a fang striking at an angle, perhaps'. In his brief the defendant concedes that this testimony is corroborative of Hope's story.

"Mrs. Ethel Smith, another niece of the defendant, testified, among other things, that the defendant had sent a trunk to her home for storage and that certain rope shown to her was in the trunk. Charles Griffen, an investigator for the district attorney, testified that he found the rope in the trunk. The significance of the testimony of these two witnesses lies in the fact that Hope when on the stand had previously identified the rope as being similar to that with which the deceased had been tied to the table when her foot was placed in the box containing the snake.

"In support of its claim that the motive underlying the deceased's untimely death was the collection of insurance moneys, the prosecution produced as a witness one Louis Berry, an insurance agent with the Mutual Life Insurance Company, who testified that he had been a customer at de-

fendant's barber shop and had solicited him for life insurance; that defendant said he was not personally interested but knew a girl who might be interested in life insurance; that about two weeks later defendant inquired as to the cost of a $5000, twenty or twenty-five year endowment policy on a girl 26 years of age, whose name he would not reveal; that defendant agreed to submit the matter to the prospect; that about one week later the defendant introduced the witness to the prospective client, Mary E. Busch, who later became the defendant's wife and for whose murder he now stands convicted; that on June 25, 1935, he delivered to her a $5000 policy which named the defendant as beneficiary, that subsequently and on July 30th, he called on the defendant in response to the latter's telephone request and the defendant inquired as to the effect on the policy of a misrepresentation by the insured at the time of applying therefor that she was married, when, in fact, she was not (deceased and defendant had been living together at the time); that the defendant stated they were not married until July 19th, following the issuance of the policy; that he (the witness) checked the matter with the company and reported back to the defendant that the policy was not affected thereby; that one premium was paid on the policy; and that after the deceased's death the defendant inquired if the company would pay under the double indemnity provisions of the policy as a result of the accidental character of her death. On cross-examination the witness testified that the defendant had procured other prospective clients for him.

"Max Galatz, a representative of the Occidental Life Insurance Company, testified that late in May, 1935, he received two applications for insurance on the life of the deceased, one for a $5000 policy and the other for a $700 policy; that defendant was named beneficiary in both; that the defendant and deceased (contrary to the fact) said they were husband and wife at the time; that he told the defendant that he would have to have more insurance on his life than the deceased had on hers; that defendant said he had ample insurance in two or three companies but applied for a $3000 policy on himself; that the policies were issued and delivered about June 12th; and that only one premium was paid by the defendant on each of said policies, including his own. On cross-examination, the witness stated that in litigation

which followed on the policies after deceased's death the defendant claimed under the double indemnity provisions but later settled for $3500, which amount (less than the face value of the policies) was paid to the defendant. Defendant's testimony given during the trial of such action was read into this record by the phonographic reporter, from which it appeared that the defendant met the deceased about March 1, 1935; that they began living together early in May, 1935; that defendant, unknown to the deceased, had arranged for a mock marriage inasmuch as he could not then legally marry deceased because of the pendency of an annulment proceeding growing out of a previous marriage; that they thereafter became legally married on July 19, 1935; and that the deceased was in 'marvelous health' up to the time of her death. In connection with the two policies last above mentioned, the defendant two or three weeks prior to deceased's death likewise made inquiry as to the effect of the misrepresentation that the parties were married at the time of making application therefor.

"E. L. Taggart, an automobile salesman, testified that he met the defendant early in 1935 and that defendant then stated that he desired to buy a cheap car with the understanding that he could turn it in on a large Studebaker in a few months upon his receipt of $10,000 from an 'estate'.

■ "Madge Reed testified, in substance, that she met the defendant in the Italian Village on July 10, 1935; that he stated he was visiting from Kansas and was staying with his sister; that the defendant became intoxicated and asked her to drive him home, which she did; that while she was at his home, a woman who identified herself as his wife (the deceased) came home unexpectedly from a convention; that the defendant telephoned her several times thereafter, including a call two days prior to the deceased's demise; that defendant visited her at her apartment on August 11th (six days after deceased had died) and stated that they were trying to frame him for his wife's death but that he would collect her insurance money, marry the witness and they would go north; that defendant stated in the event of his indictment he wanted to use the witness as a surprise witness and would give her $2,000 if she would testify that she had met the defendant and deceased five weeks previously; that on the morning of deceased's death the witness had seen the deceased

on her porch and that deceased had then complained of not feeling well, making particular mention of a sore leg; that she (the witness) and defendant registered that night at a hotel and talked over his troubles and the asserted attempt to frame him; that defendant had her make notes on a card as to how he wanted her to testify (briefly outlined above), whereupon the witness identified the card on which she had written the notes and also the hotel register. She further testified that defendant gave her $60 at that time and promised her $2000 later.

"We find no error in the rulings admitting and thereafter refusing to strike out the testimony of this witness. It tended in some degree to establish the motive advanced by the prosecution—collection of insurance money coupled with the purpose of marrying another woman. It also tends to disclose an effort on the defendant's part to establish an alibi in the event his foul deed came to light.

"At approximately this point in the trial the prosecution was about to offer in evidence a statement or confession made by the defendant in the early morning hours of May 3, 1936, in the office of the district attorney and in the presence of several persons. Preliminary to such offer, however, and upon objection thereto by the defendant, the People undertook to establish that the statement or confession was the free and voluntary act of the defendant, uninfluenced by promises, threats or persuasions. Defendant, on the other hand, undertook to establish that the statement or confession was improperly extracted from him. As a result, much of the evidence on this phase of the case is highly conflicting, the defendant in many instances contradicting the People's showing. The conflict so created was resolved against the defendant by the trial court in the first instance upon its ruling admitting the statement or confession as the free and voluntary act of the defendant and by the jury in the second instance by its verdict finding him guilty as charged. However, in view of the vigorous presentation and argument of this point upon the present appeal, we feel justified in developing the matter at some length in order that the general state of the record in this respect may be known.

"The defendant took the stand on *voir dire* in an effort to show the asserted involuntray character of the confession and testified that he had been constantly questioned, threat-

ened and beaten by the officers from the time of his arrest on April 19th, without a warrant, until he was 'booked' at the county jail on the 21st. He asserted that his ears were bruised and swollen and that he had suffered a hernia as a result of such manhandling. During this period he was assertedly proffered manslaughter punishment in exchange for a confession. His counsel testified that when he later saw the defendant in the county jail his ears were blue and swollen. Several depositions were offered by the defendant as tending to show that he was congenitally weak-minded and therefore more likely to capitulate to coercive methods than the average person.

"It appears from the testimony adduced by the People that the defendant was placed under observation in April, 1936, for suspected incest involving his niece, at which time the authorities uncovered and developed the criminal character of deceased's death which had occurred several months prior thereto. As a result of these developments the defendant was arrested on April 19, 1936. He was not taken without delay before a magistrate nor was he immediately incarcerated in the county jail as required by sections 849 and 1597 of the Penal Code. Instead, and after some preliminary questioning in the office of the district attorney, he was taken by the officers to a private home, adjoining that where the defendant had been living with his niece, and where admittedly he was held *incommunicado* for a period of about forty-eight hours, during all of which time he was admittedly subjected to incessant questioning by the officers who worked in shifts. The defendant was apparently deprived of rest and sleep during practically all of such period. At least, the prosecution failed to offer any positive testimony that defendant during this period was afforded an opportunity of going to bed, a privilege concededly enjoyed by the examining officers. In addition, one of the officers testified that during the questioning he became angered and 'slapped' the defendant's face when the defendant was said to have referred to the deceased as a 'whore'. Other than subjecting defendant to constant questioning, and the 'slap' administered to him, the several officers categorically denied that any threats or promises were made to or any physical beatings were inflicted upon the defendant during the two-day period he was being held and questioned in the private

house. Charles Griffen, the assistant chief of the bureau of investigation in the office of the district attorney, while admitting the continuous course of questioning of the defendant during this period, testified that other than the slap mentioned, no force or violence was employed on the defendant; that the defendant was calm and collected; and that he appeared unafraid and answered questions (other than admitting the crime) readily and rationally.

"Everett Davis, another investigator for the district attorney, denied that the defendant was offered a lighter punishment if he would confess and testified that the defendant was told no one could offer or promise him anything but if he wanted to tell the story they would listen. He added that of his own knowledge, the defendant slept from 3:30 to 8:00 a. m., April 21st, in a chair with his feet on a second chair. Two other officers likewise denied defendant's statement of threats and violence during the period April 19th to 21st, one of whom testified that defendant explained receiving the hernia in an automobile accident. Three deputy sheriffs, who saw the defendant (stripped and otherwise) in the county jail on and subsequent to April 21st testified, in substance, that they saw no bruises, marks or discolorations on defendant's body or head and that he made no complaints as to his treatment or condition.

"It is apparent, therefore, that the evidence is sharply conflicting on this phase of the case, other than that showing continued questioning of the defendant throughout the period of April 19th to 21st, during which an ill-advised slap was administered to him, and for all present purposes the conflicts therein must be presumed to have been resolved against the defendant by both the trial court and the jury.

"Regardless of the impropriety of holding and continuously examining the defendant for many hours in a place other than a county jail prior to the filing of any charge against him, a course which we expressly disapprove, it is of the utmost significance that a confession was neither obtained nor extracted from the defendant during such period. The record definitely discloses that this treatment of which defendant here complains failed of its asserted objective. In other words, no matter how improper the treatment of defendant between April 19th and 21st, a confession did not result therefrom. It was not until May 3, 1936,

twelve days later, that the confession sought to be introduced was obtained. In this respect, the evidence shows that the defendant was removed from the private house where he had been held and booked at the county jail on April 21st. One of his counsel took the stand and testified that he saw the defendant in the county jail on April 25th, at which time he instructed the defendant not to answer any questions in his absence. On cross-examination, said counsel admitted that he saw the defendant 'when he was arraigned' on April 21, 1936. It is apparent, therefore, that the defendant was not held *incommunicado* when the confession was forthcoming. He had enjoyed the benefit and association of counsel and had been before the grand jury and the court. It is also of the utmost importance that the defendant did not confess until after Hope, his accomplice, had been arrested on May 1st and had told the story to the officers in charge of the investigation. The defendant's confession followed within two days thereafter. Defendant testified further on *voir dire*, however, that he still suffered from the pain and memory of the prior beatings assertedly administered to him; that he was afraid to follow the advice of his counsel and continue to refuse to answer questions or to deny the statements of the officers as to the manner of the commission of the homicide; that the officers accused him of lying and threatened to take him back to the house and 'beat your God damned head off'; that he could not take another beating and therefore offered to 'gladly admit it [Hope's story] and save myself other punishment'. On cross-examination, he admitted that he did not confess following the alleged beatings administered to him by the officers during his confinement in the private house from April 19th to 21st and he also admitted that no threats, promises or beatings preceded his statement and confession in the district attorney's office on May 2d and 3d.

"Chronologically, the circumstances leading up to the confession were narrated by certain of the officers, as follows: Williard L. Killion, a deputy sheriff, testified that on the morning of May 2d, he took the defendant from his cell in the county jail to the chaplain's room; that many persons were there; that no one made any promises or exerted any coercive influence to induce the defendant to talk; that an unsuccessful effort was made to locate defendant's counsel,

as requested by him; that all statements thereafter made by the defendant were free and voluntary and without objection on his part that his counsel was not there; and that Hope was brought into the room.

"Edward F. Lynch, who reported the proceedings at this meeting, testified that deputy district attorney Williams related Hope's story to the defendant and asked the defendant if he had anything to add thereto and the defendant replied 'Nothing'. This session ended at 11:50 a. m. on May 2, 1936, whereupon the defendant was returned to his cell. Later in the day and pursuant to court order, he was taken to the scene of the homicide by a deputy sheriff. Still later, he was returned to the office of the district attorney where he answered questions in the presence of several persons. Robert P. Stewart, the chief deputy district attorney, testified that the district attorney principally examined the defendant during the afternoon of May 2d; that Hope was brought in during the session; that no promises or other improper influences were exerted over the defendant; and that defendant was rational and coherent at all times. Along about midnight the defendant was taken out to a restaurant by Killion, the deputy sheriff, and two others. While in the restaurant, the defendant, according to Killion's testimony, voluntarily unburdened himself as to the commission of the crime. In this narrative the defendant told of plotting with Hope to kill the deceased and to collect and share her insurance money. However, throughout his statement of the circumstances surrounding the commission of the crime, the defendant charged that Hope was the principal actor in the consummation of the crime. It was Hope, he said, who placed the deceased's foot in the box for the snake to bite and who later drowned deceased in the bathtub and placed her body in the fish pond. The defendant during this statement also admitted that he had had the deceased write a letter to her sister complaining of a sore foot and leg, which letter was found, unmailed, in the deceased's home on the evening of her death by the Pembertons and the defendant immediately after they had discovered her lifeless body. This letter was offered in evidence by the prosecution and there is evidence, conceded in the defendant's brief, that it was not in the deceased's normal handwriting. The inference was available to the jury that the

defendant had compelled its writing, a fact later admitted by him in his confession, to furnish, if possible, an alibi.

"At the conclusion of this restaurant statement, the defendant was returned to the office of the district attorney where, between the hours of 1:30 and 3:30 a. m. May 3, 1936, according to the testimony of several there present, the defendant freely and voluntarily detailed the circumstances of the crime in a confession which the prosecution thereupon offered and had admitted in evidence.

"It cannot be said, under all of the evidence, that the court below erred in admitting the defendant's reply to the accusatory statement and his confession as free and voluntary acts on his part. It is declared in *People* v. *Lehew,* 209 Cal. 336, 341 [287 Pac. 337], that 'Whether a confession is free and voluntary is a preliminary question addressed to the trial court, and a considerable measure of discretion must be allowed that court in determining it. . . . In *People* v. *Siemsen, supra,* [153 Cal. 387, 394 (95 Pac. 863)], it is declared that the ''admissibility of such evidence so largely depends upon the special circumstances connected with the confession, that it is difficult, if not impossible, to formulate a rule that will comprehend all cases. As the question is necessarily addressed, in the first instance, to the [trial] judge, and since his discretion must be controlled by all the attendant circumstances, the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion.'' The mere fact that the confession was made to a police or other officer of the law while the accused was under arrest, does not necessarily render the confession involuntary and inadmissible. So, also, the mere fact that a confession is made in answer to questions will not authorize its rejection, though the fact of its having been so obtained may be an important element in determining whether the answers were voluntary . . . a reviewing court cannot say that the trial court committed error in admitting a confession of guilt unless such error appears as a matter of law from the record presented. The trial court is clothed with considerable discretion in determining whether or not the confession was free and voluntary, and where the evidence is conflicting on the subject, it must be assumed that the testimony concerning a defendant's admission was properly admitted.'

"In the present case the testimony is overwhelming. to the effect that during May 2d and May 3d, when the statement and confession were made, no promises, immunities, threats or forms of violence were employed to overcome the free will of the defendant. This is corroborated by defendant's own testimony. That he was questioned for many hours is not, of itself, improper, particularly when, as testified, he freely responded thereto. Some recognition must be given to the practical problems presented in the work of crime detection. A reasonable conclusion, and one which the trial court and jury might have readily reached on all the evidence, is that the defendant broke down and confessed his participation in the crime only after his confederate and accomplice had been arrested and detailed the murder conspiracy and had been brought face to face with the defendant who had been informed of the details of his confederate's story. Each case must turn on its own facts and we therefore give but passing mention to the authorities relied on by the defendant.

"Turning our attention now to the substance of the confession, and eliminating many unnecessary details, we find defendant relating that early in July, while the deceased was away for a few days at a convention, he and Hope planned to kill her and to share equally in the proceeds of her insurance policies; that Hope first suggested a false hold-up in which deceased would be shot, but they later agreed on Hope's second suggestion of permitting a rattlesnake to bite her in the hope that the infection would prove fatal; that he gave Hope $20 and the latter had 'certain kinds of boxes made' and brought snakes up to defendant's home in them; that Hope brought three the first time and two the second, all of which proved unsatisfactory upon experimentation with chickens, rabbits, etc.; that two days before the deceased's death he gave Hope $6 to purchase two 'hot' snakes Hope had reported seeing; that these snakes were procured and kept in boxes in his garage over Saturday night (Aug. 3, 1935); that the conspirators did some drinking with deceased that night and discussed an abortion which it was claimed she desired and believed that Hope, as an asserted medical student, was to perform the following day; that Hope left and returned the next morning about 11:00, that he gave Hope all the money he had, about $100, and left about 1:00 p. m. because deceased 'had been too good

to me and I just couldn't have anything to do with that part of it'; that Hope said deceased would die in about one hour; that he (defendant) returned about 4:00 p. m. and found Hope intoxicated and that Hope had deceased 'full of liquor'; that Hope told him he had put her foot in the box containing a snake; that Hope left and returned at 6:00 a. m., Monday, August 5, 1935; that he suggested calling it off but Hope said they had gone too far to stop; that at Hope's suggestion he left for his barber shop with the understanding that Hope would 'care' for the deceased, who was still alive, by burning the 'house up'; that Hope came to the shop about 1:00 p. m. and reported that he had not burned the house but had thrown deceased 'in the bath tub and drowned her' and then placed her body in the fish pond; that he upbraided Hope for 'the worst thing you could have done' because he [defendant] 'had a wife drown in a bath tub in Colorado Springs a little while ago'; that he told Hope 'there ain't enough men in the District Attorney's office to make me talk', adding 'and there wasn't if he [Hope] had not told it'; that he then arranged to have the Pembertons, who were innocent of the situation and whose testimony is related above, go home with him; that when he left for his shop on Monday morning he did so with the idea that deceased 'was to be murdered by Hope' and they were to share equally in the proceeds of her insurance; that the snakes were purchased for that purpose and deceased, as a ruse, was informed a desired abortion was to be performed; that after deceased's burial and while intoxicated, he may have offered the Reed woman $1,000 to say she saw deceased alive in her yard on the day of her death; that the letter above referred to was written by deceased while intoxicated and under his direction; and that his statements were 'the true stuff' and made freely and voluntarily. During this session, Hope was brought in to the room and confronted the defendant.

"With the foregoing evidence before it the jury had ample support for its verdict. In his confession the defendant admitted his participation in the death of deceased, though he again undertook to point to his accomplice as the principal actor. Under settled principles, this would not, however, serve to relieve him from full responsibility for the homicide which he and his accomplice planned and perpetrated.

■ "In addition to the evidence above narrated, and as tending to prove that the death of deceased was not the result of accident, as it at first appeared, but was deliberately planned and executed in order to collect insurance money payable on the death of the victim, the prosecution offered evidence tending to show that a former wife of the defendant, equally heavily insured in favor of the defendant, while recovering from serious injuries incurred in an automobile accident in 1932, which the defendant survived with but little inconvenience, was likewise found drowned in the bathtub of their home with resulting monetary benefit to the defendant. In making the offer of proof in the absence of the jury, the district attorney stated that he would adduce evidence tending to show that the defendant struck his former wife on the head with a blunt instrument and then ran the automobile in which they were riding off the Pike's Peak Highway and the victim not having died from the injuries so incurred was later and while recuperating, drowned in the bathtub. This evidence, hereinafter briefly narrated, in our opinion, was sufficient, *prima facie*, to indicate that defendant had been a party to the death of a former wife under somewhat similar circumstances and it was apparently offered and admitted as tending to show common plan or scheme in the execution of two homicides and an absence of accident in the deceased's untimely demise. Defendant unsuccessfully objected to the admission of this evidence on the ground that it would fail to establish any of the elements of the offense for which he was on trial and would serve only to prejudice him before the jury.

"In support of its offer of proof the prosecution produced several witnesses. The first, J. D. Rogers, superintendent of the Pike's Peak Highway, testified that he first saw the defendant about 7:00 p. m., September 21, 1932, at Glenn Cove, Colorado, where the defendant reported that he had been in an automobile accident; that defendant's clothes were 'neat' and not soiled or disarranged; that he drove the defendant back to the scene of the accident, the defendant stating that he 'really don't know how it happened' as his (former) wife had been driving coming down the mountain while he was looking across the valley with field glasses; that defendant said the car suddenly left the road and that he (defendant) jumped from the car after it had travelled about fifty feet down the mountainside; that the car came to

rest against a large boulder one hundred and fifty feet below the road; that he (the witness) found the deceased lying on the *right hand side* of the car (though she was supposed to be driving on the left side) with her head down hill and her feet on the running board of the car; that her clothes were free of dirt; that the car rested on its wheels; that there was considerable blood *inside* the car, especially on the back of the cushion on the *right* side and on the floor board; that a hammer on the floor of the car was covered with blood; that he smelled liquor from the deceased and felt a softness behind her ear when he lifted her; that there were foot prints back about eighty feet where the car left the road and on either side of the tire marks, some pointing to where the car went off the road; that the defendant's car was the last one to come down the mountain that particular evening, all others having checked out ahead; and that the defendant appeared quite calm.

"Miss Grace Yarnell, a cousin of this former wife of the defendant, testified that she had visited the injured woman while she was recuperating in the hospital, which covered the period from September 21 to October 8, 1932; that she saw the injuries over her cousin's right eye and back of her ear; that after October 8th she saw the injured person in a cottage in Manitou Springs, Colorado, where defendant had moved her prior to complete recovery; and that defendant had told her he was thrown free of the car and had lifted his (former) wife from the car and placed her on the ground with blankets about her.

"Gerald Rogers testified that he worked in the local grocery store in Manitou Springs; that defendant came to the store about 5 p. m. on October 14, 1932, ordered some groceries and asked that they be delivered; that defendant then said that he would ride home with the witness; that he (the witness) went into the kitchen and the defendant went into the bedroom and then to the bathroom; that defendant then called him and he saw defendant's wife lying on her back in a half-filled tub of lukewarm water. On cross-examination, it appeared that the defendant had ridden home with him on prior occasions.

"Dr. George B. Gilmore testified that he was coroner in 1932; that he saw defendant's (former) wife on October 14, 1932; that she was then on a bed and dead; that defendant said he had been away from home for several hours at the

time of her death; that the defendant related that the doctors in the hospital had theretofore warned deceased against washing her hair because of her head injuries but that she apparently had undertaken it in his absence and drowned as a result; and that he (the witness) suggested an autopsy but defendant opposed it, saying he 'couldn't permit anything of that sort.' The doctor then identified certain letters subsequently addressed to him by the defendant requesting a change in the death certificate in order to show that the drowning was attributable to the injuries received in the earlier automobile accident (apparently to facilitate collection under the accidental and double indemnity provisions of the insurance policies.)

"Mrs. Irene F. Snyder, bookkeeper at the hospital, testified that defendant's former wife was there confined from September 21 to October 8, 1932, and that the defendant had stated at the time that he was without funds to pay the bill but intended negotiating a loan on an insurance policy. There is other evidence that defendant was financially embarrassed and had borrowed money about this time.

"The prosecution produced Doctor Decker, concededly qualified to express medical opinions, and who examined and interpreted certain X-ray photographs theretofore taken in the Colorado hospital, who testified that, in his opinion, the defendant's former wife suffered fractures of the skull from two blows, one on the side and the other on the front of the head; that the fractures had been caused by a hard, moving object being projected against the head and not by the head being projected against a hard, stationary object; and that the blow on the side of the head had been received first. That this evidence tends to support the prosecution's theory of a felonious assault on defendant's former wife must be admitted and defendant concedes in his brief that it was for the jury to weigh this evidence as against his conflicting medical testimony touching the same subject.

"John A. McKelvey testified that when defendant purchased a car from him in 1932, he stated that his previous car had been wrecked when the steering knuckle broke and the car went off the Pike's Peak road *as he was driving*.

"C. A. Pries, who was with the Prudential Life Insurance Company in 1932, testified that the defendant at that time told him he had an insurance prospect for him; that he later met Miss Winona Wallace (who subsequently became

defendant's wife and, as shown, was found drowned in the bathtub of their Colorado home) at defendant's apartment; that defendant said he wanted a $5,000 policy on himself and a similar policy on the lady; that the defendant asked if he could be named beneficiary in the latter policy and was informed that this was not possible until the parties were married; that the two policies were later delivered, the defendant being named beneficiary in the lady's policy; that upon the death of the lady (who, as stated, had prior to death married defendant) the defendant asked for double indemnity payment under the policy; and that the defendant only carried his own policy for three months. The witness thereupon identified a check sent later to the defendant in payment of his claim under the policy.

"Bayard Judd, who was with the Kansas City Life Insurance Company, testified that just prior to the death of Winona Wallace James (defendant's former wife), she and defendant had sought an immediate loan on that company's policy covering her life.

"We find no error in the trial court's admission of this evidence touching the Colorado incident involving the death of a prior wife of the defendant under circumstances similar in many respects to the circumstances surrounding the death of the deceased for which he was on trial. In each instance the defendant had placed his asserted victim in touch with insurance agents with a view to an ultimate procurement of life insurance on her. In each instance defendant inquired whether he might be named beneficiary when the parties were not married. In each instance he received a negative reply and thereafter married the asserted victim. In each instance a policy or policies were issued naming him as beneficiary. In each instance the insured was shortly thereafter found drowned in or near the home she occupied with the defendant under circumstances having an appearance of accident but upon full and close inspection tending strongly to indicate foul play. In each instance the defendant claimed under the accidental double indemnity provisions of the policy or policies and, in each instance, ultimately profited financially by the collection of his wife's insurance.

"In view of these many similar and unusual circumstances, we are of the view that the evidence of the Colorado incident was admissible not to prejudice the defendant by proof of the prior commission of another crime but as tending to es-

tablish that the death of the deceased in the present action was not accidental, as it might at first appear, and as claimed by the defendant, but was the result of a general plan or scheme on the defendant's part to insure, marry and murder his victims in order that he might thereby profit financially. In its instructions to the jury, several of which were requested by the defendant, the court below properly limited the purpose for which it might consider this evidence. That evidence of prior similar acts and crimes is admissible for the purposes already mentioned, is now well established. (*People* v. *Stutsman*, 66 Cal. App. 134 [225 Pac. 477]; *People* v. *Barnes*, 111 Cal. App. 605 [295 Pac. 1045]; *People* v. *Morani*, 196 Cal. 154, 160 [236 Pac. 135]; *Holt* v. *United States*, 42 Fed. (2d) 103, 106, 107; *People* v. *Gosden*, 6 Cal. (2d) 14, 24 [56 Pac. (2d) 211]. See, also, the English 'bathtub' murder case, *R.* v. *George Joseph Smith*, 21 Crim. App. Rep. 229, 236.)

"The Morani case, *supra*, contains the following: ' "In the case of *People* v. *Seaman*, 107 Mich. 348 [61 Am. St. Rep. 326, 65 N. W. 203], it is said: 'Upon principle and authority it is clear that where a felonious intent is an essential ingredient of the crime charged, and the act done is claimed to have been innocently or accidentally done, or by mistake, or when the result is claimed to have followed an act lawfully done for a legitimate purpose, or where there is room for such an inference, it is proper to characterize the act by proof of other like acts producing the same result as tending to show guilty knowledge, and the intent or purpose with which the particular act was done and to rebut the presumption that might otherwise obtain.' " '

"It is stated in the Holt case, *supra*, that 'No good purpose would be served by a review of the myriad of cases where evidence of other and collateral transactions has been admitted to prove the *quo animo, scienter,* motive, or intent of the defendant in the doing of a particular act; nor in restating the circumstances under which such evidence may strongly tend to support the charge made. Many of the authorities would be inapplicable to the present case, for there the evidence was introduced to show knowledge, while here its purpose is to negative the claim of accident and the alleged innocent motive, injected into the case by the defendant himself. It is sufficient to say that from the earliest

times the propriety of admitting evidence for the purpose
here stated has been fully recognized. . . .

" 'When introduced to show intent, or repel the possi-
bility of accident or mistake, the time of occurrence of the
collateral circumstance is immaterial. Such duplication of
the same situation is just as abnormal after the time laid
in the indictment as before. Accordingly it is held that
evidence of the collateral circumstance after as well as be-
fore the alleged commission of the crime may be admitted.
. . . The courts generally use the phrase "at or about the
same time," but it is clear, we think, that the length of the
separating interval, and the fact that evidence of but one
other similar instance was here proved, go only to the weight
of the evidence, not to its admissibility. . . . In each case
the question is, and of necessity must be, whether the evi-
dence tendered has probative effect, logically and under the
doctrine of chances. If it has, and we think such is the
case here, it should not be excluded simply because it also
shows the commission of another crime. This last fact is
immaterial.'

"In the Gosden case, *supra,* the evidence tended to show
that approximately six years prior to the death of his wife
for which defendant was then on trial, a former wife of the
defendant came to an untimely death under somewhat similar
circumstances. We there declared that 'Turning now to
the questions of law raised by appellant, the first conten-
tion made is that the trial court erred in admitting evi-
dence of the death of appellant's former wife, Vivian Taylor
Gosden. It is not necessary to repeat the evidence to show
the similarity of the circumstances surrounding the deaths
of appellant's two wives. This evidence tended to show that
each died of strychnine poisoning, each was insured with
the appellant as the beneficiary, and in each case the ap-
pellant attempted immediately upon the death of the wife
to collect the insurance upon her life. The evidence as to
the death of the first wife and the fact that her life was in-
sured with the appellant as beneficiary was properly ad-
mitted to show the motive of appellant in the murder of his
second wife. (*People* v. *Northcott,* 209 Cal. 639, 652 [289 Pac.
634, 70 A. L. R. 806].)'

"Nor do we think that in the present case the prose-
cution was required, as urged by defendant, to prove the
elements of the asserted Colorado crime beyond all reason-

able doubt, as would be the case were the defendant standing trial for such asserted earlier offense. In this connection it is declared in *Lund* v. *State*, 207 Ind. 347 [190 N. E. 850, 853], that 'It is only the ultimate material facts to which the rule of reasonable doubt applies. The facts regarding the other transactions were simply evidentiary facts introduced for the purpose of being considered, together with all of the other evidence in the case, upon the question of criminal knowledge and intent; and though the jury may have entertained some reasonable doubt as to some of the other transactions, or some of the other items of evidence, which tend to prove guilty knowledge or intent, if, notwithstanding that fact, and having considered the evidentiary facts, doubtful and otherwise, they were convinced beyond a reasonable doubt of the ultimate fact of guilty knowledge and intent, it is sufficient.'

"In 1914, Ohio adopted a contrary rule when in the case of *Baxter* v. *State*, 91 Ohio St. 167 [110 N. E. 456], to which the defendant refers us, it was declared that 'Evidence that an accused was guilty of other similar offenses must be such that a jury would be authorized to find him guilty of these offenses.' However, defendant has failed to note that in the later case of *Scott* v. *State*, 107 Ohio St. 475 [141 N. E. 19, 26], the Ohio court renounced the rule of the Baxter case, declaring: 'Is the rule in the Baxter case based upon sound reason? It has long been the general rule that a conviction is warranted if on the whole evidence the jury is satisfied beyond a reasonable doubt that every material element charged in the crime exists and that the defendant is guilty of the crime charged. In other words, it is the holding that the state need not establish each particular fact of the case beyond a reasonable doubt, if it establishes beyond a reasonable doubt the existence of every material fact alleged in the indictment and the guilt of the defendant. . . . If testimony with regard to other similar crimes is to be dealt with as other evidence, it falls under this general rule and need not be discarded simply because particular items tending to prove other similar offenses are not established beyond a reasonable doubt, so long as the jury, from the whole testimony, are convinced to a moral certainty of the guilt of the defendant of the crime charged and of the existence of every material element necessary to establish that guilt.

" 'That this common sense view of the situation obtains in certain other American jurisdictions is shown by the fact that while the case of *Baxter* v. *State, supra,* is the leading case which lays down the doctrine here discussed, it is by no means universally followed in its exact terms. While the Baxter case is frequently cited, the degree of proof required in this class of testimony is held on excellent authority to be positive or substantial, but not "beyond a reasonable doubt".'

"In effect, we recently held in *People* v. *Thorne,* 10 Cal. (2d) 705, 708 [76 Pac. (2d) 491], that evidence which merely *tends* to show an attempt to commit or the commission of other offenses is admissible to prove common scheme or plan even though it falls short of proving the *corpus delicti* of such other offenses. In so concluding, we quoted from *People* v. *Whiteside,* 58 Cal. App. 33, 38–41. [208 Pac. 132], to the effect that 'If viewed with respect to its relevancy as tending to show that the facts constituting the charge contained in the information were a part of a scheme to defraud the public as distinguished from a single individual, it was not necessary in order that Stivers' testimony be admissible that an attempt be shown to have been made to sell him any stock or that the evidence, if accepted as true, should tend to show the commission of an offense like in character to the one charged. . . .'

"We also there quoted from *People* v. *Sindici,* 54 Cal. App. 193, 196 [201 Pac. 975], to the effect that 'Where the very doing of the act charged is in issue [as here] and is to be evidenced, one of the essential facts admissible is the person's plan or design to do the act. This plan or design itself may be evidenced by his conduct, and such conduct may consist of other similar acts so connected as to indicate a common purpose including in its scope the act charged. . . . '

"In *People* v. *Baker,* 25 Cal. App. (2d) 1 [76 Pac. (2d) 111], it is declared in part that 'It is not essential that such similar transactions shall have resulted in the commission of a crime. It is sufficient if they tend to prove a scheme of the defendant which included the acts charged.'

"In view of what has been said we are of the opinion that upon its offer of proof of the prior and in many respects similar Colorado incident, the prosecution made a substantial showing tending to prove that on that occasion

(as well as on the one here under review) the defendant had financially benefited by the untimely drowning at home of his wife on whom, as here, he had previously procured insurance in which, as here, he was named beneficiary. Upon this substantial offer, later supported by the proof above narrated, the court below correctly admitted the evidence touching the prior incident in order that the jury in its weighing of the entire evidence might determine whether it tended to show a common plan or scheme on the defendant's part or tended to overcome the asserted element of accident involved in the death of the subsequent wife, for which death he was then on trial.

"But, even if we assume, as defendant would have us do, that the authorities require the asserted prior Colorado homicide to be proved beyond all reasonable doubt, no prejudice could have resulted to the defendant from the admission of the evidence for the court below, concluding that the rule as is now being assumed, instructed the jury that it must believe beyond all reasonable doubt that defendant's former wife was murdered before it could consider the facts of that transaction in connection with the case at bar. It is to be assumed that the jury abided by the instructions given by the court.

"In an effort to show that the deceased was alive on Monday morning, August 5th, when according to Hope's story she was dead, defendant produced a neighbor who testified that when he was in his yard at 9:25 a. m. on said morning he saw a mature, blonde woman, approximately five feet eight inches tall, wearing a rust colored smock, in the defendant's yard; that he had seen a woman in the yard on previous occasions but could not say it was the same one; and that he had never met the deceased nor had she been pointed out to him. Even if it be conceded that the person so described by the witness bore a resemblance to the deceased, the matter was one for the jury to resolve along with all other conflicts in the evidence.

"The defendant's sister testified that she visited with him and the deceased early in July, 1935, and saw Hope there on several occasions; that she heard the deceased state she desired an abortion whereupon the defendant said Hope would 'take care of her'. The witness also testified that during 1933–34 the defendant had loaned her several hundred dollars. This evidence was apparently offered for the

purpose of overcoming the prosecution's showing that defendant was financially embarrassed and in need of the deceased's insurance moneys.

"Defendant also called one of the barbers in his shop who testified he saw the defendant on August 5, 1935 (after the killing but prior to the finding of deceased's body), and that he appeared normal, was not intoxicated and did not exude an odor of liquor. This testimony obviously was intended to rebut portions of Hope's testimony, particularly that part to the effect that during and immediately following the commission of the homicide he and the defendant had imbibed rather freely of liquor.

"The defendant also produced a naturalist who expressed his views as to the habits of snakes, their average life when held in captivity and the effect of snake bite upon human beings.

"The defendant took the stand in his own defense and denied Hope's story that they had planned to murder, and had murdered, the deceased, by means of rattlesnake infection, drowning, or otherwise. He did testify, however, that Hope came to his home on July 3, 1935, in an intoxicated condition and expressed a desire to stay; that he told Hope to return sober the following day; that Hope, at the time, had with him a box of rattlesnake venom (which tends to corroborate portions of the prosecution's testimony to the effect that Hope was at the defendant's home and possessed reptile venom); that on July 6th, Hope came to his barber shop and again asked leave to stay at defendant's home; that he gave Hope the key and he came that night and stayed several days; that he introduced Hope to the deceased, his sister and his niece as 'Dr. Smith'; that at one of the breakfasts the parties discussed the pregnancy of the deceased and deceased during the course of the conversation stated that she could not go through with the ordeal of child-birth and that 'Dr. Hope will take care of me' (though earlier defendant had testified he introduced Hope as 'Dr. Smith'); that he saw Hope again on August 3d (which corroborates Hope's story of being with defendant two days prior to the homicide) but that Hope did not deliver any rattlesnakes to him; that Hope came to his home on August 4th (the day prior to the homicide) to abort the deceased (again corroborating Hope as to being at defendant's home at that time); that he did not approve of an

abortion and left home while Hope 'cared' for deceased; that Hope left about 1:00 p. m. of that day and he did not see him again between that time and the time of the asserted drowning of deceased the following morning; that while he aided the deceased in taking out insurance on her life he did not do so with any thought of thereafter murdering her and collecting the same; that he did not cause the deceased to write the unmailed letter to her sister, found in the house and referred to above, but in his 'confession' had admitted so doing because one of the officers required it; and that on the day before her death the deceased stated to him that she had cut her foot on a tin can while walking barefooted in the yard (this apparently to explain the laceration on her foot which the prosecution contended was inflicted by the fang of a rattlesnake). On cross-examination the district attorney confronted the defendant with his inconsistent statements made to the police on August 7th, two days after deceased's demise, and several months prior to his arrest therefor, to the effect that she had not mentioned a cut or swollen foot to him. Inconsistencies between his testimony and prior statements to friends as to the movements of deceased and himself on Sunday, the day preceding her death, appear in the evidence. In rebuttal of his testimony that he opposed the abortion which deceased assertedly desired, the prosecution recalled Mrs. Pemberton, the friend who was with her husband and defendant when the body was found, whereupon she testified that a few days before the deceased's death the defendant told her (the witness) that deceased was 'crazy to have a baby, but I don't want one'. We will not undertake to set out additional inconsistencies in statements of the defendant. These were matters for the jury to determine in its consideration and evaluation of the entire evidence. The jury was fully instructed on the law and no complaint is here made of any of the instructions.

"The entire record has been examined and all contentions advanced have been considered. Reference to other items of evidence not here mentioned would neither add to nor detract from the conclusion here reached. Sufficient has been said to illustrate that the verdict finds ample support in the evidence and that the judgment entered thereon should remain undisturbed."

■ In the briefs filed before the former opinion was rendered, appellant made no claim that any error had been committed in the giving or refusing of instructions to the jury. Appellant filed his petition for rehearing but made no such claim therein. Such claim was first advanced in a supplemental brief filed by appellant shortly before the oral argument on rehearing. An appellate court is ordinarily justified in ignoring points so tardily raised but, owing to the nature of this case, we have reviewed the entire charge to the jury, giving particular attention to appellant's claim of error with respect thereto.

■ The challenged instruction was one of several given on the subject of the necessity for corroboration of testimony of an accomplice. (Pen. Code, sec. 1111.) This particular instruction was given for the purpose of advising the jury of the character of testimony which might constitute corroboration. Appellant's attack is directed solely at the first sentence of this instruction which reads as follows: "You are instructed in this case that as Charles Hope is an accomplice or co-conspirator of the defendant in the murder alleged in the indictment, it is necessary that his testimony be corroborated." The instruction then continues at some length defining corroboration. It concludes "and so in this case, if you find, beyond a reasonable doubt, that the state has proven that the crime of murder was committed by the defendant, as charged in the indictment, and there is any corroboration of the testimony of the witness, Hope, of any character, falling under the definition of corroboration and the illustrations called to your attention in this instruction, then it will be your duty, under the law, to find the defendant guilty as charged".

When this instruction is read as a whole, and more particularly when it is read with the other instructions given, it is impossible to believe that the jury understood, as contended by appellant, that the court was instructing the jury that defendant had murdered the deceased and that Hope had assisted. In an instruction which was given before the challenged instruction, the court instructed the jury at the request of appellant that "Charles Hope is an accomplice in this case if the crime of murder is committed and his testimony, uncorroborated by other evidence, which of itself tends to connect the defendant with the commission of the crime, is insufficient to sustain a conviction. Therefore, if you and

each of you believe the testimony of Charles Hope to be true, still you cannot convict the defendant unless you find other evidence which shall, without the testimony of Charles Hope, tend to connect the defendant with the murder of Mary James."

In addition to these instructions, the trial court gave several other instructions on the subject of corroboration, which last-mentioned instructions are not challenged. The court further gave the usual instructions to the effect that the defendant was presumed to be innocent until the contrary was proved beyond a reasonable doubt; that the jury was the sole and exclusive judge of the weight of the evidence; and that it was its duty "to determine all questions of fact arising from the evidence". The court further instructed the jury, that it could not convict the defendant "unless you, and each of you, is satisfied beyond all reasonable doubt, that he killed and murdered Mary James".

Appellant has taken but a single sentence from one of the numerous instructions given to the jury and has sought to claim that the giving of said single sentence constituted prejudical error requiring a reversal. A review of the entire charge to the jury and of the entire cause, including the evidence, convinces us that the error, if any, in the giving of the challenged instruction was not prejudicial. This conclusion finds support in the fact that appellant's counsel, after conducting the trial and reviewing the record for the purpose of presenting the cause on appeal, failed to find anything in the instructions given which he deemed of sufficient importance to call to the attention of the court in his briefs presented prior to the time that the rehearing was granted.

The judgment and order are, and each is, affirmed.

CURTIS, J., Dissenting.—I dissent for the reasons stated in the dissenting opinion filed in this action at the time of the rendition of the former opinion. This dissent is set out in full in volume 89 (2d) of the Pacific Reporter at pages 54 to 108 thereof. (*People* v. *Lisenba.*)

Houser, J., concurred.

Rehearing denied. Curtis, J., and Houser, J., voted for a rehearing. Carter, J., did not participate.