[Crim. No. 4862. Second Dist., Div. One. June 28, 1948.]

THE PEOPLE, Respondent, v. HARVEY MORTON et al., Defendants; DONALD A. DOWNS, Appellant.

Nathan Newby, Jr., for Appellant.

Fred N. Howser, Attorney General, and James A. Doherty, Deputy Attorney General, for Respondent.

YORK, P. J.—Defendants were charged by a second amended information with the crime of robbery, committed while armed with a deadly weapon, to wit: a revolver. Defendant Morton was also charged with two prior convictions of felonies and defendant Downs with one prior conviction

for which they served terms of imprisonment in a state prison. Both admitted the prior convictions and pleaded not guilty to the offense charged. The jury returned a verdict of not guilty as to defendant Morton, and found defendant Downs guilty of robbery of the first degree, and that he was armed at the time of the commisison of such offense. Thereafter the oral motion for a new trial made by defendant Downs was denied. This appeal is prosecuted by him from the ensuing judgment of conviction.

It is here contended by appellant that (1) the court erred in admitting the "alleged" confession made by him; (2) that the acquittal of defendant Morton establishes an alibi for appellant and proves his innocence; and (3) the facts do not support the verdict of the jury.

The record herein discloses that the two defendants were arrested by Los Angeles Police Officers Cecil and Stanshaw at about 2:45 a. m. of July 17, 1947, at which time defendants were seated in an automobile parked in front of 511 East 59th Place, Los Angeles; that as the right door of the automobile was opened upon the order of Officer Cecil, a fully loaded five-chambered revolver with the serial number filed off, fell from the car to the curb; that when defendant Morton, who was sitting in the right-hand seat, was searched, a pair of dark glasses was found in his left-hand shirt pocket; that this defendant apparently hid the glasses in the car, where they were later discovered by the officers; that he also had one or two dollar bills in his pocket and enough change to make a total of $8.99. A search of Downs, the appellant, who was in the driver's seat, produced the sum of $9.41, consisting of one or two one-dollar bills and the balance in small change. A nearly empty whisky bottle was also found in the car, and although neither defendant appeared to be under the influence of liquor, the breath of each showed that he had been drinking. Both the revolver and the dark glasses were introduced in evidence.

In a line-up at the 77th Street Police Station later in the morning, appellant was identified by Campbell Peter Ledgerwood as one of the two men who had robbed him of approximately $18.42 at 1:30 or 2 a. m. on the morning of July 17. The defendant Morton was not identified.

At the trial Ledgerwood testified that he was employed as a service station attendant at 5720 South Vermont Avenue, Los Angeles; that on the night of July 16th, as was

the custom, he worked alone from 8:30 p. m. until 12:30 or 1 a. m.; that after closing the station at 1 or 1:30, said witness was engaged in cleaning up the station; that all the lights in the station, except the 100 or 150-watt night light in the office were off, and the street lights, except for one light on every other post, were also turned off; that at approximately 1:30 or 2 a. m. appellant and an unidentified man approached Ledgerwood, and Downs asked him for a gallon of gas in a can, meanwhile the other man stood a few feet away and said nothing; that Ledgerwood told appellant he did not wish to reopen his cash report and suggested that they try another station down the street a block. However, the two men did not depart and appellant again approached the witness, who was unsuccessfully attempting to start a car parked in the station, and said, "You cannot get yours started either, can you?" The witness answered "No." and proceeded to lock up the office, when appellant said to him: "Come on in the office." The witness complied, and appellant then said: "Open it up," or "Open the safe up." About this time Ledgerwood noticed that appellant was carrying a gun. The witness testified he could see only about three-fourths of an inch of the gun, but he could see the sight at the end of the barrel, and knew that it was a gun; that he was in fear of the gun and opened the top safe and gave appellant all the cash, around $18.32 or $18.42. This money consisted of three or four one-dollar bills and a quantity of change. Appellant also demanded that the bottom safe be opened, but the witness did not have the key to that safe. Downs (appellant) then directed the witness to walk down the street and not return until he thought appellant and his companion had gone. The witness did as directed, returning a little later and calling the police. Although admittedly unfamiliar with firearms, the witness Ledgerwood testified he was sure that appellant was holding a gun at the time of the robbery, and upon cross-examination gave the following testimony: "Q. And you don't know whether this is the gun or not? A. No, I don't; I did not see enough of it. Q. Are you familiar with firearms? A. No, I never handled one in my life; I am afraid of them and I don't know anything about them. Q. How do you know this was a firearm or a gun? A. I just took it for granted, because I saw the sight on the end of it, unless it was a piece of small tubing or something like that with a sight on it. Mr. Johnston:

That is speculative, your Honor. The Witness: It was the barrel of a gun all right; I could see the sight on the end of it.''

This witness further testified that while he was in the station with appellant, he noticed a man standing outside on the sidewalk; that he could not say that this was the same man who came to the station with appellant; that he could not describe the man's appearance except that he was wearing a pair of dark glasses.

Officer Tidyman, the investigating officer, testified that on the day following the hold-up, he had three conversations with appellant at the 77th Street Station; that the witness and appellant were the only persons present and that the conversations were free and voluntary, without promise of immunity or hope of reward. At the second conversation, appellant was told that Ledgerwood had identified him as the man who held up the service station, whereupon appellant admitted to Officer Tidyman that he was the man and that Morton was his accomplice. At the third conversation, Tidyman reduced to writing the substance of his conversation with appellant, showed his written notes to appellant and asked him to sign the writing. After reading the notes for approximately three or four minutes, appellant signed the paper. In substance, this conversation reduced to writing by Tidyman is as follows:

''He told me that the gun belonged to him, and that the numbers were filed off when he got it, and he had purchased it from a man for $15.00; that he did not know who the man was, did not know his name, but that he did not think the gun was hot. He said he had picked Morton up the evening prior to the holdup at his home, I believe the address was 845 West 56th Street, and that they had ridden around in his mother's car and had gone to a number of cocktail lounges, and two or three other locations, and I don't recall exactly what they were, and that they had been drinking during the evening. He said that Mr. Morton wanted to pull a holdup, and they drove around some more, but Morton got cold feet, so when they stopped at the service station that was held up, that he went in and held the man up and Morton stayed outside''; and they split the money approximately 50-50. This witness further testified that he wrote out the so-called confession in the presence of appellant, who freely and voluntarily signed his name thereto, using the officer's pen, and that no force, violence or duress were used by said witness in order to get appellant to sign the confession.

Appellant, both on *voir dire* examination outside the presence of the jury, and before the jury when testifying in his own behalf, gave his version of how the confession came to be signed, claiming that promises of immunity and undue influence were used upon him and that he signed the confession without reading it, not because it was true but because of the promises made him. Appellant testified in substance with respect to the circumstances surrounding his signing of the confession, as follows:

That it was about 2 a. m. of July 17, 1947, when he was arrested, and that around 8 he was called out of his cell for a lineup to be identified and was then led back to his cell; that Mr. Tidyman followed him and told him that he had been identified as the gunman, whereupon appellant told him there must be some mistake and to bring in the man so that he could talk with him; that the officer left, returning in five minutes with the information that the man had gone, and asked appellant if he wished to admit the crime; that appellant said he did not, as he had no connection with it. ''I did not at any time admit my guilt to any crime to Mr. Tidyman, but the words in this statement are his own version of what happened. . . . I am on parole at present from San Quentin, and the night we were arrested, the shorter of the two arresting officers notified me that Harvey (Morton) was also on parole. . . . That in itself is a violation of parole. We are not allowed to associate with another inmate. . . . I had not known that he was on parole, and he did not know that I was. Well, that meant that I would be sent back to San Quentin for a violation of parole, and I also was intoxicated, and that had some bearing on it, so at the time of the signing of this statement, Mr. Tidyman told me, he said, 'Don, you know you are going back to prison, because you violated your parole,' and I said, 'Yes.' He said, 'Why don't you come clean and tell us what this is all about? If you will admit it, I will try and help you all I can.' I asked him, or I told him at first that I had no connection with this crime, he spoke of, and then he told me, he said, 'Well, if you will sign it, if you will admit this crime, I will see to it that this charge of robbery is dropped, and you can go back to San Quentin on a straight violation of parole.' . . . If I signed the confession, the charge would be dropped and I would not have to come up and stand trial, I could go right on back to San Quentin, and these three months

which I have spent here now could have been counting on my time, so I thought I could lose nothing by signing it. I still said nothing about admitting the crime or anything, and he drew up this form which is more or less his own version of what happened on that night and asked me to sign it, which I did. Immediately after I signed it, he called my parole officer . . . and explained the case and the circumstances . . . he asked whoever was on the other end of the phone how he would go about getting the charge dropped, and at the time before I signed it he told me that it was up to himself and the victim to drop the charge, and that is the reason I signed it. There are statements in here, some of which are true, that I have acknowledged all along the line, and there are some in here that are just ridiculous. . . . I did not commit the crime, I don't know what the events were, but whatever events he could make up as to how the crime was handled, was all right with me; I was signing a confession and I did not care what was in it."

The version given by appellant was contradicted in all substantial particulars by Officer Tidyman, and by the witness Jollings, the state parole officer in charge of Downs and Morton, and who, according to Downs, had been called on the telephone by Tidyman, who stated in Downs' presence that the robbery charge would be dropped. Jollings testified that he had no recollection of this, although he made a written memorandum of the conversation. Jollings further testified in the presence of the jury that appellant admitted to him that he had committed the offense and at no time claimed to have made a deal with the police department by which he would not be prosecuted if he confessed to this robbery. The confession was admitted in evidence over the objection of appellant's counsel.

In answer to the trial court's question: "How did your friend's gun happen to be in the automobile you were in?", appellant stated: "I can explain that. The night before I was arrested, a friend of mine who lives in the same apartment . . . asked if I would take him over to collect . . . a debt, and I said yes. He did not have a car, so I drove him over to this man's house, and he talked to him and he came back and said, 'We will have to go down to their office,' . . . and we went into the office, and this fellow had left a revolver for these men to sell. They are gunsmiths, and they were supposed to have sold the revolver and sent him the money. . . . They

had sold the revolver and had not made any attempt to pay him the proceeds, so there was a little argument, and my friend became quite cross and told them to get the gun back, so they said, 'Well, we haven't got it here, you will have to come back tomorrow if you want it.' So the next day, the day of the night I was arrested, I took him back to the gunsmith's and he would not go inside. He sat out in the car and asked me to go and get the gun . . . and he (the gunsmith) gave it to me and I put the revolver in my pocket and took it out and gave it to him, and on the way home he stopped and bought a bottle. He was intoxicated then, and when I got home I let him out of the car and he went on in the house . . . and a short time later I went over and picked up Harvey. I don't know how the gun got in there, unless he laid it down and evidently did not pick it up again.''

Appellant urges that ''the court did not diligently examine the circumstances surrounding the making of the confession''; and that ''the confession is an absolute necessity to the prosecution as the only evidence upon which Downs could have been convicted . . . or in any way connected with the commission of the crime.''

The above résumé discloses that the question of the voluntary character of the confession was thoroughly examined during the trial herein by interrogatories addressed not only to appellant but to Officer Tidyman and as well to Mr. Jollings, the state parole officer. Before Officer Tidyman was permitted to testify regarding the signed statement made by appellant, he was asked: ''Was that conversation free and voluntary? A. Yes. Q. And made without any promise of immunity or hope of reward? A. None. Q. And without the use of any force, violence or duress? A. That's correct. Q. Morton was not present at that time, nor within hearing? A. No, he was not. Q. What was the conversation?''

Mr. Jollings testified to the following effect: ''Q. Will you state in substance what Officer Tidyman said to you in reference to the dropping of any robbery charge against Downs? A. He did not say anything about dropping any charges; he merely discussed with me about the arrest. . . . Q. Did you have a conversation with the defendant Downs in the County Jail on or about August 4th of this year? A. Yes. Q. What was that conversation in reference to the dropping of any robbery charges? A. I don't remember discussing dropping the charges. We discussed the fact that he was in

violation of his parole and I asked about the particular arrest. Q. What did he tell you? . . . A. He said he admitted he was with the other man that particular evening, and he knew he was in violation, and that they did the job. The Court: Is that what he said, 'I did the job'? The Witness: I don't know his words that he used, but I could tell what I wrote. He said he admitted his guilt and said he could not understand why he did it. . . . Q. By Mr. Johnstone: Did the defendant at any time tell you that he had entered into any deal with the police department whereby, if he confessed the robbery, he would not be prosecuted for the robbery? . . . A. No, He did not say he had entered into any deal with any particular party. . . . Q. By Mr. Johnstone: In other words, on August 4th, the defendant at no time mentioned to you, at the time he told you he committed the robbery, that he was doing so because the police department promised him that if he confessed the robbery, he would not be prosecuted for it? A. He did not tell me that. Q. He did not tell you he only confessed to the robbery, but that he did not actually commit it? A. No, sir. Q. He told you he had committed the robbery? A. Yes."

As stated in 4 California Jurisprudence, Ten-Year Supplement, page 663, section 202: "The question as to whether a proffered confession was freely and voluntarily made by the defendant is one which is to be determined by the trial court, not by the jury.

"*The propriety of the court's decision,* in resolving the question as to admissibility of the confession is to be determined by the reviewing tribunal in view of the discretion with which the trial court is clothed. Where the evidence bearing on the question is conflicting, the decision will not be reversed.

"*The circumstances of the case are determinative* of the question as to admissibility of the proffered confession; the issue is not to be resolved by reference to any rule of law. The scope of the inquiry extends to all circumstances attending the making of the confession, and all such facts are to be considered by the court in determining the question as to whether the confession was made voluntarily or involuntarily."

Also, in *People* v. *Lisenba,* 14 Cal.2d 403, 421 [94 P.2d 569], the court stated: "The mere fact that the confession was made to a police or other officer of the law while the accused was under arrest, does not necessarily render the confession in-

voluntary and inadmissible. So, also, the mere fact that a confession is made in answer to questions will not authorize its rejection, though the fact of its having been so obtained may be an important element in determining whether the answers were voluntary . . . a reviewing court cannot say that the trial court committed error in admitting a confession of guilt unless such error appears as a matter of law from the record presented. The trial court is clothed with considerable discretion in determining whether or not the confession was free and voluntary, and where the evidence is conflicting on the subject, it must be assumed that the testimony concerning a defendant's admission was properly admitted.''

In the circumstances presented by the record herein, no error was committed by the trial court in admitting the confession in evidence.

As to appellant's point that the confession is the only evidence upon which his conviction can be based, this is completely refuted by the record. Appellant was positively identified by Ledgerwood as the man who came into the service station and held him up at the point of a gun. While it is true, that appellant's mother, Mrs. Barrett, and her friend, Mrs. Tillim, both testified that they had a conversation with Ledgerwood on July 19, 1947 at 6 'p. m., at which time he stated to them that he could not honestly say that he identified the defendant Donald Downs as the man who committed the robbery, this testimony merely created a conflict in the evidence which was resolved by the jury against the appellant.

Appellant also urges that the acquittal of defendant Morton establishes an alibi for appellant and proves his innocence. Defendant Morton admitted that he was with appellant from 7:30 p. m. of July 16, 1947, until their arrest around 2:45 a. m. of July 17th; and testified that during this period they were making the rounds of various cocktail lounges drinking beer and whiskey until they became intoxicated. While Morton had a pair of dark glasses on his person, which he sought to conceal, and had money in his pocket in an amount equal to approximately one-half of that stolen from Ledgerwood, he was never identified as being at the scene of the holdup, for the reason that the companion of appellant remained at a distance from Ledgerwood during the time he was being held up.

It does not follow that because the jury was unable to find defendant Morton guilty beyond a reasonable doubt that it,

therefore, gave entire credence to his testimony that he and appellant were together all during the evening and did not commit the robbery charged. The verdict is conclusive proof that the jury did not accept Morton's story at its face value.

The verdict of the jury convicting appellant of robbery is amply supported by the evidence. In order to overthrow the verdict of conviction, there must be no substantial evidence in the record which on any hypothesis would support a finding that appellant is guilty as charged. As hereinabove shown, evidence was presented establishing that a sum of $18.32 or $18.42 was taken from the victim Ledgerwood by appellant in the early morning hours of July 17, 1947; appellant was postively identified as the person who took the money while armed with a deadly weapon, and that the victim Ledgerwood was in fear of the gun.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.