[No. H025310. Sixth Dist. Nov. 20, 2003.]

THE PEOPLE, Plaintiff and Appellant, v.
AL JOSEPH DeGUZMAN, Defendant and Respondent.

## Counsel

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan M. Helfman and Jeffrey M. Laurence, Deputy Attorneys General for Plaintiff and Appellant.

Barry Gerald Rekoon for Defendant and Respondent.

## Opinion

**PREMO, J.**—After a court trial, the trial court found defendant Al Joseph DeGuzman guilty of 54 counts of possessing "any explosive" in a public location (Pen. Code, § 12303.2)[1] and 54 counts of possessing "any explosive" with intent to injure (§ 12303.3). At sentencing, however, the trial court dismissed all but one conviction for each offense in reliance on what it felt was binding precedent. On the remaining convictions, it sentenced defendant

---

[1] Further unspecified statutory references are to the Penal Code.

to a seven-year upper term for the intent-to-injure offense and a six-year upper term for the public-location offense that it stayed pursuant to section 654. The rationale for the dismissals was an interpretation of and the specific holding in *People v. Kirk* (1989) 211 Cal.App.3d 58 [259 Cal.Rptr. 44] (*Kirk*), which generally held that a weapons-possession statute prohibiting possession of "any" prohibited weapon was ambiguous as to whether the defendant was subject to multiple convictions for possessing more than one unlawful item of the same kind at the same time and place. Applying the statutory interpretation rule of lenity, *Kirk* concluded that the defendant in question was entitled to have the ambiguity resolved in his favor.

The People appeal from the order dismissing the convictions. (§ 1238, subd. (a)(8).) They contend that the trial court erred in its interpretation of sections 12303.2 and 12303.3. We agree. We therefore reverse the order with directions to pronounce judgment on all convictions.

## BACKGROUND

Drugstore employee Kelly Bennett processed film. One evening she developed photographs of pipe bombs, Molotov cocktails, guns, and ammunition. She showed the pictures to her supervisor. The supervisor declined to call the police and instead elected to telephone the customer. He failed to make contact with the customer. Bennett then telephoned her police officer father for advice. Bennett's father advised her to contact the police. Bennett telephoned 911 and gave information about the pictures. She also reported that the film order had been made the previous evening with a customer-selected option that it be ready in 24 hours. Police immediately staked out the drugstore and, shortly thereafter, arrested defendant when he picked up the photographs.

Bomb squad officers searched defendant's room in his parents' home. They found the following: a duffle bag containing a propane bomb (18 propane canisters tied together in three groups of six with pipe bombs inserted into the gaps and electric fuses rigged between the bombs and model rocket engines); a grocery bag containing 34 pipe bombs with bands of nails, screws, and BB's taped to the bombs; and a backpack containing 19 Molotov cocktails. They also found a battery and two clocks that had been combined to act as an electric timing device for the propane bomb. They further found a semiautomatic rifle (with 400 rounds of ammunition), a sawed-off shotgun (with 133 shotgun shells), a sniper rifle (with 100 rounds of ammunition), a sawed-off rifle (with over 300 rounds of ammunition), and a bolt-action rifle.

Defendant's computer records explained the following: defendant was an admirer of Eric Harris and Dylan Klebold, the infamous 1999 massacres of

Columbine High School students in Colorado; for two years (beginning shortly after Columbine), he had been planning to commit mass murder at a school and was constructing his arsenal to do so; he ultimately decided to carry out the plan at De Anza College; he selected a date at the beginning of the academic quarter (in the belief that the campus would be crowded with students returning from vacation), at a time during the lunch hour (again in the hope of a crowd), and at an interval past President Bush's inauguration (in the hope that he would garner maximum publicity); he intended to store some guns and bombs on the second floor of the library; he then planned to place the propane bomb in the cafeteria with a time-delay detonation; he was to return to his car, retrieve the rest of his arsenal, and await the explosion; after the explosion, he intended to shoot students and throw bombs into classrooms while making his way to the weapons in the library; he then planned to go on the library roof to shoot and throw bombs "until killed."

Police also found a tape-recorded statement made by defendant that defendant called a "message to you the world before I die." The statement begins as follows.

"It's, actually, Monday January 29th, the year 2001, and tomorrow I plan to die. Actually, I plan to kill before I die. I do this with a clear head. I consider myself very sane. Well, not even sane. I don't even use the—I don't—I don't like to consider myself insane or sane or within the bounds of humanities just statuses and—and all their—I would just say boundaries that are labeled, their classifications. Consider myself evolved. I have attained self-awareness and I really consider myself above—above the mind of every person, humanity. I don't consider myself human. I don't consider myself a Homosapien. Consider myself homosuperior, superman, Nitzche, and superman, uber mench, actually, able to make decisions beyond regular bounds, norms and mores of society. [¶] Tomorrow I'll be killing as many people as I can. I hope that my first bomb, a very large propane tank bomb—I think, I'm pretty sure, uh, six, uh, six, eighteen, actually, small-like pipe bombs—Or what was it? Eighteen propane tank bombs, pipe bombs that I can actually detonate and puncturing them and igniting them. I hope that bomb kills, actually, anywhere from 10 to 30 people. I'm leaving this 'cause—just like all you to know what I thought about your world and what I'll be doing tomorrow with my guns, my bombs, and just my weaponry."

The statement later emphasizes: "Let me reiterate that I want to kill as many people as I can. I don't care how I die or what happens to me just as long that when I put a bullet through my head I've killed at least twenty—twenty humans."

Bennett called the police on the evening of January 29, 2001.

## KIRK

In *Kirk*, the defendant stole a rifle during one burglary and a shotgun during another. He kept the weapons and sawed off the barrels. Police found the weapons in the defendant's home. A jury convicted the defendant of two counts of possessing a sawed-off shotgun. The relevant statute was former section 12020, subdivision (a). It provided: "Any person . . . who . . . possesses . . . any instrument or weapon of the kind commonly known as a . . . sawed-off shotgun . . . is guilty of a felony, . . ." (Stats. 1984, ch. 1414, § 3, pp. 4972–4973; Stats. 1984, ch. 1562, § 1.1, p. 5499; see *Kirk, supra,* 211 Cal.App.3d at p. 60.) On appeal, the defendant contended that he could not be convicted of more than one violation of the statute. A panel of the Third District Court of Appeal agreed with defendant.

The court first concluded that the statute was "facially ambiguous." (*Kirk, supra,* 211 Cal.App.3d at p. 65.) Writing for the court, Justice Richard M. Sims III explained: "As noted, the statute is directed at 'Any person . . . who . . . possesses . . . *any* instrument or weapon. . . .' (Italics added.) By its use of the term 'any' rather than 'a,' the statute does not necessarily define the unit of possession in singular terms. [Citation.] The statutory ambiguity is compounded by section 7 which provides in pertinent part that 'the singular number includes the plural, and the plural the singular; . . .' 'The rule of construction enunciated in section 7 is no mere rubric—it is the law.' [Citation.] Read together, former section 12020, subdivision (a) and section 7 fail to provide any warning that separate convictions will result for each weapon simultaneously possessed." (*Ibid.*)

The court next stated that it could not discern any relevant legislative intent: "Although we have been cited no legislative history shedding light on the Legislature's intentions in enacting former section 12020, subdivision (a), we have looked for some appropriate clue on our own. We have found none illuminating the issue tendered here." (*Kirk, supra,* 211 Cal.App.3d at p. 65.) The court then concluded that the defendant was entitled to the benefit of the · statutory ambiguity. (*Ibid.*)

In *People v. Rowland* (1999) 75 Cal.App.4th 61 [88 Cal.Rptr.2d 900] (*Rowland*), a different panel of the Third District Court of Appeal built upon *Kirk*. There, a correctional officer found an envelope in the defendant's laundry bag holding three wood shafts with sharpened ends. A jury convicted the defendant of three counts of possessing a weapon while in state prison. The relevant statute was section 4502, subdivision (a). It provides: "Every person who, while at or confined in any penal institution . . . possesses . . . any dirk or dagger or sharp instrument . . . is guilty of a felony . . . ." (See *Rowland,*

*supra*, 75 Cal.App.4th at p. 65.) On appeal, the defendant contended that he could not be convicted of more than one violation of the statute. The court agreed.

The court first relied cursorily on *Kirk*: "The use of the word 'any' in this statute, as in the statute at issue in *Kirk*, persuades us defendant is subject to only one conviction for his simultaneous possession of three sharp wooden sticks in prison." (*Rowland, supra*, 75 Cal.App.4th at p. 65.)

The court then bolstered its reliance by finding significance in the Legislature's response to *Kirk*: "We find further support for this interpretation of the statute in legislative action, or inaction as the case may be, taken subsequent to the publication of *Kirk*. In 1994, specifically in response to *Kirk*, the Legislature amended section 12001 by adding new subdivisions (k) and (*l*). (Stats. 1994, First Ex. Sess. 1993–1994, ch. 32, § 1.) The new sections provided as follows: [¶] '(k) For purposes of Sections 12021, 12021.1, 12025, 12070, 12072, 12073, 12078, and 12101 of this code, and Sections 8100, 8101, and 8103 of the Welfare and Institutions Code, notwithstanding the fact that the term "any firearm" may be used in those sections, each firearm or the frame or receiver of the same shall constitute a distinct and separate offense under those sections. [¶] (*l*) For purposes of Section 12020, a violation of that section as to each firearm, weapon, or device enumerated therein shall constitute a distinct and separate offense.' [¶] These new subdivisions were added with the express intent of overruling the holding in *People v. Kirk* 'insofar as that decision held that the use of the term "any" in a weapons statute means that multiple weapons possessed at the same time constitutes the same violation.' (Stats. 1994, First Ex. Sess. 1993–1994, ch. 32, § 5.) Conspicuously absent from the new subdivisions (k) and (*l*) is any mention of section 4502, subdivision (a), the statute at issue here. [¶] Application of the rule of statutory construction, *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another), suggests that, with the addition of new subdivisions (k) and (*l*), the Legislature intended to permit application of the *Kirk* holding to any statute not specifically listed in the new subdivisions. [Citation.] [¶] This maxim of statutory construction is not immutable and is inapplicable if its operation would contradict a discernible and contrary legislative intent. [Citations.] We have discovered no such intent. [¶] We realize, the Legislature announced that its express intent in adding subdivisions (k) and (*l*) to section 12001 was to overrule the holding of *Kirk* to the effect that the use of the term 'any' in a weapons statute means that multiple weapons possessed at the same time could constitute but one violation . . . . [¶] . . . . [¶] [But] [w]e do not read the further expression of Legislative intent as making the list of statutes included in new subdivisions (k) and (*l*) open-ended to include even omitted weapons statutes such as section 4502, subdivision (a). . . . [¶] It would nullify the applicable rule of statutory construction to read into this legislative pronouncement an intent to

extend the statutory definition of the word 'any' set forth in subdivisions (k) and *(l)* to all weapons statutes wherever found, even though only certain statutes were specified in those subdivisions. To hold otherwise would be to speculate the Legislature committed an oversight and then, by judicial opinion, to correct that oversight. Were we to indulge in the presumption the Legislature merely overlooked section 4502 at the time it listed the code provisions expressly set forth in subdivisions (k) and *(l)* of section 12001, we would be superimposing on the statute our notion of what the Legislature actually intended when, by the statute's specific written provisions, it did not. We cannot appropriately do any of that. . . . If the Legislature intends the word 'any' as used in section 4502 to have the same meaning as it does in section 12020, subdivision (a), it needs to say so." (*Rowland, supra,* 75 Cal.App.4th at pp. 65–67, fn. omitted.)

## DISCUSSION

Defendant follows the *Kirk-Rowland* trail. He poses that (1) the use of the word "any" in sections 12303.2 and 12303.3 makes the statutes ambiguous, (2) the Legislature's failure to include sections 12303.2 and 12303.3 in subdivisions (k) and *(l)* of section 12001 means that *Kirk* is controlling, and (3) under *Kirk*, he is entitled to the benefit of the statutory ambiguity. We disagree with this analysis and agree with the People's analysis.

Preliminarily, we agree that the statutes in question are superficially similar to the ones in *Kirk* and *Rowland*.

Section 12303.2 states: "Every person who recklessly or maliciously has in his possession any destructive device or any explosive on a public street or highway, in or near any theater, hall, school, college, church, hotel, other public building, or private habitation, in, on, or near any aircraft, railway passenger train, car, cable road or cable car, vessel engaged in carrying passengers for hire, or other public place ordinarily passed by human beings is guilty of a felony, and shall be punishable by imprisonment in the state prison for a period of two, four, or six years."

Section 12303.3 states: "Every person who possesses, explodes, ignites, or attempts to explode or ignite any destructive device or any explosive with intent to injure, intimidate, or terrify any person, or with intent to wrongfully injure or destroy any property, is guilty of a felony, and shall be punished by imprisonment in the state prison for a period of three, five, or seven years."

We will therefore accept the *Kirk-Rowland* premise that the statutes are ambiguous in the sense that they do not necessarily define the unit of

possession in singular terms. But it does not follow that the rule of lenity applies to resolve the ambiguity in defendant's favor.

■ The rule of lenity applies only if the court can do no more than guess what the Legislature intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule. (*People v. Avery* (2002) 27 Cal.4th 49, 58 [115 Cal.Rptr.2d 403, 38 P.3d 1].) "Thus, although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*Ibid.*) This principle follows from section 4, which states: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

In short, "There is order in the most fundamental rules of statutory interpretation . . . . The key is applying those rules in the proper *sequence*." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298].)

We must therefore first attempt to discern legislative intent. As stated in *People v. Rouser* (1997) 59 Cal.App.4th 1065, 1069 [69 Cal.Rptr.2d 563]: " 'When statutory language is susceptible of more than one meaning, we must accept the meaning as intended by the framers of the legislation, if we can ascertain that intention. [Citation.] We must examine the legislative history and statutory context of the act under scrutiny to discern legislative intent. [Citation.]' [Citations.]"

Only if we cannot ascertain a legislative intent, do we apply the rules of lenity (see *Kirk, supra,* 211 Cal.App.3d at p. 65 [court found nothing shedding light on the Legislature's intention]) or *expressio unius est exclusio alterius* (see *Rowland, supra,* 75 Cal.App.4th at p. 66 [court found no legislative intent]).

We first observe that the statutes in question are part of a network of statutes prohibiting certain conduct involving destructive devices. Other statutes in the network prohibit the possession of devices (§ 12303), the carrying or placement of devices on passenger vessels (§ 12303.1), the sale or transportation of devices (§§ 12303.6, 12304), the explosion of or attempt to explode devices with the intent to murder (§ 12308), and the explosion of devices causing varying degrees of bodily injury or death (§§ 12309, 12310).

There can be no doubt that the Legislature enacted this network to single out destructive devices for special treatment because such devices are funda- mentally different from ordinary weapons. "Almost uniquely, bombs have an

'inherently dangerous nature.' [Citation.] . . . As one court has observed: 'A bomb has special characteristics which obviously differentiate it from all other objects. In the first place, the maker often loses control over the time of its detonation. . . . In the second place, it may wreak enormous havoc on persons and property. In the third place, its victims are often unintended sufferers. And finally, considering its vast destructive potentialities, it is susceptible of fairly easy concealment.' [Citation.]" (*People v. Morse* (1992) 2 Cal.App.4th 620, 646 [3 Cal.Rptr. 2d 343].)

█ Illustrative is section 12303.3 itself, which is fundamentally different from ordinary weapons statutes such as those at issue in *Kirk* and *Rowland*: rather than prohibiting mere possession, section 12303.3 equates possessing a bomb with exploding or attempting to explode a bomb.

In *People v. Ramirez* (1992) 6 Cal.App.4th 1762 [8 Cal.Rptr.2d 624], we addressed section 12308, which punishes "Every person who explodes, ignites, or attempts to explode or ignite any destructive device or any explosive with intent to commit murder . . . ." There, the defendant exploded a single device intending to murder two victims and suffered two convictions for violating section 12308. On appeal, he contended that, since he exploded a single device, he committed the actus reus of the crime but once and could not suffer two convictions. We disagreed. We held that section 12308 defined the crime in terms of an act of violence against the person.

█ The only material difference between sections 12303.3 and 12308 is that the former requires an intent to injure or the like while the latter requires an intent to murder. Thus, under the reasoning of *People v. Ramirez*, there can be no doubt that a person who explodes more than one device at the same time and place with intent to injure more than one person commits multiple violations of section 12303.3. This follows despite the Legislature's use of the word "any" to define the unit of possession.

█ We therefore discern a legislative intent that the word "any," as used with reference to exploding a device in section 12303.3, defines the unit of possession in singular terms. Since the Legislature has equated possessing with exploding in section 12303.3, the term "any" in section 12303.3 has the same meaning with reference to possessing as it has to exploding. (*People v. Godwin* (1995) 31 Cal.App.4th 1112, 1117 [37 Cal.Rptr.2d 708].)

We discern the same legislative intent concerning the use of the word "any" in section 12303.2.

█ It is a well-established rule of statutory construction that when a word or phrase has been given a particular scope or meaning in one part or portion

of a law it shall be given the same scope and meaning in other parts or portions of the law. (*People v. McKay* (2002) 27 Cal.4th 601, 621 [117 Cal.Rptr.2d 236, 41 P.3d 59].)

Sections 12303.2 and 12303.3 are part of the same statutory scheme. The only material difference between them is that the former prohibits possession in certain places while the latter prohibits possession with an intent to injure or the like. It would be incongruous for the Legislature to intend that the word "any" have a different meaning in section 12303.2 than it has in section 12303.3.

Illustrative of the Legislature's intent as to the meaning of the word "any" in the destructive-device network is section 12307. This statute states, in relevant part: "The possession of any destructive device in violation of this chapter shall be deemed to be a public nuisance and the Attorney General or district attorney . . . may bring an action before the superior court to enjoin the possession of any destructive device. [¶] Any destructive device found to be in violation of this chapter shall be surrendered . . . ."

Section 12307 is plainly directed at each and every destructive device possessed by the person in question: an injunction would be ineffective unless directed at each and every device; the surrender obligation would be meaningless unless applied to each and every device. In other words, section 12307 uses the word "any" to define the unit of possession in singular terms.

■ In summary, we discern a legislative intent that the word "any," as used in sections 12303.2 and 12303.3, defines the unit of possession in singular terms. A person is therefore subject to multiple convictions under each statute when he or she possesses more than one unlawful item of the same kind at the same time and place.

## DISPOSITION

The order dismissing the convictions is reversed. The trial court is directed to vacate the judgment and thereafter pronounce judgment on all convictions.

Rushing, P. J., and Elia, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 18, 2004.