[No. D057178. Fourth Dist., Div. One. Aug. 5, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
KATHY ANN GREEN, Defendant and Appellant.

[redacted]

COUNSEL

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BENKE, Acting P. J.**—Penal Code[1] section 12022.6, subdivision (b) provides the losses incurred in the commission or attempted commission of all felonies may be aggregated for purposes of imposing the prison enhancements provided under that statute if the defendant admits, or the trier of fact determines, the losses arose from a "common scheme or plan."

The jury in 2009 convicted defendant Kathy Ann Green of two counts of grand theft by embezzlement. (§§ 487, subd. (b), 503.) The jury also found true the one-year sentence enhancement in then applicable subdivision (a)(1) of section 12022.6 based on its implicit finding the losses from the two counts arose from a "common scheme or plan."

Green contends the evidence is insufficient to support the jury's finding the losses from the two counts arose from a "common scheme or plan" as provided in subdivision (b) of section 12022.6. As we explain, we agree and

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

reverse the imposition of the one-year sentence enhancement. In all other respects, the judgment of conviction is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *Count 1*

Green in 2003 became the president of the board of the homeowners association (HOA) where she lived. When she took over in that capacity, the HOA was without a bookkeeper. Green thus was the interim bookkeeper for the HOA and was responsible for paying the HOA's bills and keeping the checkbook reconciled.

HOA policy required the signature of two board members to sign checks drawn on the HOA bank account and board approval of any check over $500. Under no circumstances were board members allowed to draw on the HOA's funds to pay personal expenses.

While in control of the HOA's checkbook, Green used money from the HOA account to pay her own expenses. To overcome the two-signature policy, Green forged the signatures of other board members on the checks. Overall, Green spent about $12,000 of the HOA's money for her personal benefit. Her theft came to light in August 2004 when the HOA's bank notified another board member the HOA's account was "severely overdrawn." An audit of the HOA bank records revealed the accounting discrepancy. When the accounting discrepancy surfaced, Green stated she intended all along to pay back the money.

### B. *Count 2*

Green worked for 14 years at D&L Auto Parts (D&L) in Blythe, California, until her termination in September 2004. As the office manager and secretary, Green's responsibilities at D&L included reconciling the daily sales invoices and receipts from the Blythe store and a second store, preparing the sales reports and depositing money into D&L's bank account. Green had access to the D&L computer system and had the authority to modify, adjust or delete sales invoices.

---

[2] The underlying facts of this case are generally not in dispute. Nonetheless, to the extent there is a conflict in the facts we review them in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

In summer 2004, the manager of D&L, who also was the son of the owners, found the amount of cash Green was depositing in D&L's bank account did not always match the amount of cash generated the previous day by the business. By way of example only, on September 1, 2004, the manager counted $400.68 in cash, yet Green only deposited $177.72 in cash. There also was a bank payout of $20 on that day.

In June 2004, one of the owners of D&L discovered an invoice for a refund check of $2,943 from a workers' compensation insurer. Although the invoice was in the file, when questioned, Green claimed she did not know what became of the check itself. D&L's owners conducted a thorough audit of its records, which brought to light multiple accounting discrepancies attributable to Green: Green deleted invoices from the D&L computer system to free up cash in the till. She also delayed depositing customer checks to increase the amount of the deposit to offset the cash she stole from the business. Green also took cash from the business and recorded the amount as "cash paid-out" for dummy transactions allegedly made on behalf of the business. Green's theft from D&L resulted in a loss to the company of about $49,000.

In November 2009, a jury convicted Green of two counts of grand theft embezzlement (§§ 487, subd. (a), 503) and found true the enhancement under former subdivision (a) of section 12022.6 after the jury aggregated the losses from counts 1 and 2 based on its implicit finding the losses arose from a "common scheme or plan" and exceeded $50,000.[3] (See § 12022.6, subds. (b), (c).) The trial court sentenced Green to the midterm of two years for count 1, plus one-third the midterm or eight months for count 2, plus one year under the enhancement for a total sentence of three years eight months. Among other assessments, the court ordered Green to pay $61,681.63 in victim restitution ($12,681.63 on count 1, and $49,000 on count 2). Green challenges only the one-year sentence enhancement.

## DISCUSSION

### A. *Governing Principles*

■ "The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent." (*People v. Flores* (2003) 30 Cal.4th 1059, 1063 [135 Cal.Rptr.2d 63, 69 P.3d 979]; see also *People v.*

---

[3] Effective January 1, 2008, the Legislature raised the statutory minimum from $50,000 to $65,000 for imposition of the one-year enhancement in subdivision (a) of section 12022.6. (Stats. 2007, ch. 420, § 1.) The amendment applies prospectively only. (*Id.*, § 2.)

*Trevino* (2001) 26 Cal.4th 237, 240 [109 Cal.Rptr.2d 567, 27 P.3d 283].) "To determine legislative intent, we turn first, to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People v. Flores, supra,* 30 Cal.4th at p. 1063.)

We thus turn to the words of section 12022.6.

### B.   *Section 12022.6*

When Green committed the crimes in counts 1 and 2, section 12022.6, former subdivision (a)(1) provided for a one-year enhancement if a defendant "takes, damages, or destroys any property in the commission . . . of a felony, with the intent to cause that taking, damage . . . or destruction," and the loss exceeds $50,000. Here, Green was found to have embezzled $12,681.63 from the HOA she served as an officer and $49,000 from her employer. Thus, unless the two losses are aggregated, neither exceeded the $50,000 needed to support imposition of the one-year enhancement under section 12022.6, former subdivision (a).

As we have noted, subdivision (b) of section 12022.6 allows losses to be aggregated in order to meet the statutory minimum for imposition of the sentence enhancement under that statute. Subdivision (b) of section 12022.6 provides in part:[4] "In any accusatory pleading involving multiple charges of taking, damage, or destruction, the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and *arise from a common scheme or plan.* All pleadings under this section shall remain subject to the rules of joinder and severance stated in Section 954."[5] (Italics added.)

---

[4] As we discuss *post,* section 12022.6 has been amended several times since the words "common scheme or plan" were added to the statute in 1992. (See Stats. 1992, ch. 104, § 1, p. 342, eff. June 30, 1992.) Initially, these words were included in subdivision (d) of section 12022.6, but were later moved to subdivision (b) of that statute without any substantive changes. (See Stats. 1997, ch. 551, § 2, p. 3339.) The 2008 amendment to section 12022.6, which, among other things, raised the statutory minimum for imposition of the one-year enhancement in subdivision (a), did not make any substantive changes to subdivisions (b) and (c) of section 12022.6. (See Stats. 2007, ch. 420, § 1.)

[5] Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses . . . of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause

Subdivision (c) of section 12022.6 provides: "The additional terms provided in this section shall not be imposed unless the facts of the taking . . . in excess of the amounts provided in this section are charged in the accusatory pleading and admitted or found to be true by the trier of fact."

### C. *Meaning of the Words "Common Scheme or Plan"*

The issue to be decided in this appeal is whether the losses from counts 1 and 2 arose from a "common scheme or plan" within the meaning of subdivision (b) of section 12022.6, as found by the jury pursuant to subdivision (c) of that statute. The record shows Green did not ask the trial court to instruct on the meaning of the words "common scheme or plan" in subdivision (b) of section 12022.6,[6] the trial court correctly followed the words of the statute when instructing on this enhancement[7] and neither defense counsel nor the prosecutor argued during closing argument what the words mean.

It appears from the parties' briefs their disagreement regarding the phrase "common scheme or plan" is not necessarily based on the meaning of these words but rather on their application to the facts of this case. In any event, we review this question of statutory construction de novo. (*People v. Trask* (2010)

---

shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

[6] Green does not argue the trial court had a sua sponte duty to instruct on the meaning of the words "common scheme or plan." (See *People v. Sanders* (1995) 11 Cal.4th 475, 562 [46 Cal.Rptr.2d 751, 905 P.2d 420] [" 'When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law,' " absent a request by a party " 'the court is not required to give an instruction as to its meaning in the absence of a request.' "].) Green also has not forfeited the issue by failing to ask the trial court to instruct on the meaning of these words. (See *People v. Scott* (1994) 9 Cal.4th 331, 354 [36 Cal.Rptr.2d 627, 885 P.2d 1040] [an unauthorized sentence—one that could not be lawfully imposed under any circumstances—is not subject to the forfeiture rule when it is correctable independent of any factual issues presented by the record].)

[7] The trial court instructed the jury with then applicable CALCRIM No. 3220 as follows: "If you find the defendant guilty of the crimes charged in Counts 1 and 2, you must then decide whether the People have proved the additional allegation that the value of the property taken was more than $50,000. [¶] To prove this allegation, the People must prove that: [¶] 1. In the commission or attempted commission of the crime, the defendant took property; [¶] 2. When the defendant acted, she intended to take the property; [¶] AND [¶] 3. The loss caused by the defendant's taking the property was greater than $50,000. [¶] If you find the defendant guilty of more than one crime, you may add together the loss from each crime to determine whether the total losses from all the crimes was more than $50,000 if the People prove that: [¶] A. The defendant intended to and did take property in each crime; [¶] AND [¶] B. Each crime arose from a *common scheme or plan*. [¶] The value of property is the fair market value of the property. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

191 Cal.App.4th 387, 394 [119 Cal.Rptr.3d 91]; *People v. Popular* (2006) 146 Cal.App.4th 479, 484 [52 Cal.Rptr.3d 708].)

### 1. *Development of the Law*

As originally enacted, section 12022.6 contained no provision for aggregating losses. In *People v. Bowman* (1989) 210 Cal.App.3d 443, 446 [258 Cal.Rptr. 358], the court reluctantly struck the one-year enhancement imposed against the defendant under then applicable section 12022.6 because the "value of the property taken [by defendant] in the commission of any one of the 10 felonies for which defendant [was] convicted was not in excess of $25,000 [(then the statutory minimum)]" and because the language of the statute did *not* allow the jury to aggregate the value of all the property taken in the commission of all 10 felonies.

In explaining it felt "compelled" to strike the enhancement, the court in *People v. Bowman* noted that result was inconsistent with the purpose of the enhancement provision, which was to deter large-scale crime. (*People v. Bowman, supra,* 210 Cal.App.3d at p. 447.) The court also went on to note: "It seems inconsistent to enhance one sentence where the defendant commits a single burglary and takes property valued in excess of $25,000 and not enhance the sentence where defendant commits multiple burglaries, none of which involve property with a value in excess of $25,000 but which, when aggregated, exceed $25,000. Both defendants have engaged in large-scale crime and yet only the first defendant receives an enhanced sentence. Clearly the defendant who commits multiple burglaries poses the same, if not a greater, threat to society. The illogic of this inconsistent treatment is particularly compelling in a case such as this [one] where there is but one victim. Clearly, as to the victim, it makes no difference whether the defendant commits multiple crimes or but one; the loss is the same. Similarly, in light of the purpose of the statute, the consequences to the defendant should be the same. *We urge the Legislature to consider amending section 12022.6 to rectify this apparent inconsistent treatment.*" (*Ibid.,* fn. omitted, italics added.)

In response, the Legislature in 1990 amended section 12022.6 to permit aggregation of losses. (See Legis. Counsel's Dig., Assem. Bill No. 3087 (1989–1990 Reg. Sess.) 5 Stats. 1990, Summary Dig., p. 642 ["This bill would state that in any accusatory pleading involving multiple charges of taking, damage, or destruction of the property, the additional terms provided . . . may be imposed if the *aggregate losses* to the victims from all felonies exceed the amounts specified in the law." (italics added)]; see also Assem. Com. on Public Safety, Rep. on Assem. Bill No. 939 (1991–1992

Reg. Sess.) Apr. 23, 1991, p. 2 ["Last year, the Legislature enacted AB 3087 (Hayden—Chapter 1571, Statutes of 1990) which allowed amounts taken, damaged or destroyed against a series of victims to be aggregated in determining whether the various thresholds for the enhancement were applicable," and which "was in response to <u>People</u> v. <u>Bowman</u>, (1989) 210 Cal.App.3d 443 [258 Cal.Rptr. 358] . . ."].)

The Legislature again amended section 12022.6 in 1992 to raise the statutory minimum for imposition of the enhanced terms. (See Legis. Counsel's Dig., Assem. Bill No. 939 (1991–1992 Reg. Sess.) 4 Stats. 1992, Summary Dig., p. 44.) The 1992 amendment also provided for the first time the aggregation of losses if they arose from a "common scheme or plan." (*Ibid.* ["This bill . . . provide[s] that in any accusatory pleading involving multiple charges of taking, damage, or destruction of the property, the additional terms provided . . . may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in the law and arise from a common scheme or plan, rather than if the aggregate losses exceed the amounts specified in the law."].) However, the Legislature did not define the meaning of the words "common scheme or plan."[8]

### 2. *Use of the Words "Common Scheme or Plan" in Related Statutes*

In our independent research, we have discovered the Legislature used the words "common scheme or plan" in what can be described as a "network of statutes" (see *People v. DeGuzman* (2003) 113 Cal.App.4th 538, 546 [6 Cal.Rptr.3d 739]) similar to section 12022.6. " 'It is a well-established rule of construction that when a word or phrase has been given a particular scope or meaning in one part or portion of a law it shall be given the same scope and meaning in other parts or portions of the law.' " (*People v. McKay* (2002) 27 Cal.4th 601, 621 [117 Cal.Rptr.2d 236, 41 P.3d 59] [noting its interpretation of the words "present" a license or other evidence of identity " 'for examination' " under § 40302, subd. (a) is consistent with the Legislature's use of this language in other statutes].)

For example, the words "common scheme or plan" appear in section 186.10, subdivision (c)(2)(B). Under this statute, a sentence for the crime of money laundering is subject to an additional term of imprisonment if, among other things, the facts of the transaction or transactions of a certain value carried on for criminal purposes are charged in an accusatory pleading and the "violations charged in that pleading arise from a *common scheme or plan*

---

[8] *People v. Bowman* also sheds no light on this issue because the defendant in that case committed a single burglary. (See *People v. Bowman, supra,* 210 Cal.App.4th at pp. 445–446.)

and the aggregate value of the alleged transactions or attempted transactions is of a value covered" within the statute. (§ 186.10, subd. (c)(2)(B), italics added.)

These same words appear in section 500, which governs the failure by a person to transmit funds to a foreign country as instructed by a customer. Under subdivision (b)(1) of section 500, if the total value of the funds received from the customer is less than $950, the person who otherwise violates the statute is guilty of a misdemeanor. However, if the total value of the money received from the customer is $950 or more, "or if the total value of all moneys received by the person from different customers is . . . [$950] or more, and the receipts were part of *a common scheme or plan*," the person is guilty of a felony and "is punishable by imprisonment in the state prison for 16 months, 2, or 3 years, by a fine not exceeding . . . [$10,000], or by both that imprisonment and fine." (*Id.*, subd. (b)(2), italics added.)

These same words appear in Welfare and Institutions Code section 10980 governing welfare fraud. Specifically, subdivision (h)(2) of Welfare and Institutions Code section 10980 provides if there are multiple charges in an accusatory pleading of violations of public assistance (as provided in subds. (f) and (g) of § 10980) "committed by means of an electronic transfer of benefits," the additional terms provided in the statute "may be imposed if the aggregate losses to the victims from all violations exceed the amounts specified . . . and *arise from a common scheme or plan*." (Italics added.)

As is the case in section 12022.6, subdivision (b), the Legislature in these related statutes did not define the words "common scheme or plan."[9] In addition, our independent research shows that no court has yet to address the meaning of these words in any of these statutes.[10]

---

[9] Our discussion and holding on the meaning of the words "common scheme or plan" in subdivision (b) of section 12022.6 does not govern the meaning of these same words in these other statutes. (See *People v. Nance* (1991) 1 Cal.App.4th 1453, 1464 [2 Cal.Rptr.2d 670] [" 'Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, *and an opinion is not authority for a proposition not therein considered.*' "]; see also *People v. Handley* (1970) 11 Cal.App.3d 277, 282 [89 Cal.Rptr. 656], disapproved on another ground as stated in *People v. Diaz* (1978) 22 Cal.3d 712, 716–717 [150 Cal.Rptr. 471, 586 P.2d 952] [" 'Whatever may be said in an opinion that is not necessary to a determination of the question involved is to be regarded as mere dictum.' "].)

[10] While the words "common scheme or plan" appear in each of these statutes (and perhaps others), we note the statutes apply different tests to determine whether the enhancement applies. By way of example only, subdivision (b) of section 12022.6 states the common scheme or plan is determined by the *losses* set forth in the accusatory pleading. Subdivision (h)(2) of Welfare and Institutions Code section 10980 also speaks in terms of *losses* in determining whether there is a common scheme or plan. However, in subdivision (c)(2)(B) of section 186.10, the common plan or scheme is determined from the *violations* charged against

### 3. *Evidence Code Section 1101 and the Admissibility of Prior Acts Evidence Based on a "Common Scheme or Plan" or Similar Words*

Our independent research also shows the words "common scheme or plan" or similar words[11] are frequently used in discussing the admissibility of evidence under Evidence Code section 1101 to prove, among other things, the defendant committed the act charged. (See, e.g., *People v. Ewoldt, supra,* 7 Cal.4th at pp. 393–394.) This research shows several cases discussed the words "common scheme or plan" (or similar words) *before* these words were added to section 12022.6 in 1992. The "Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' [Citations.]" (*People v. Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288].)

One of the primary issues in *People v. Ewoldt* involved whether evidence of other uncharged prior acts on a child was admissible under Evidence Code section 1101.[12] There, the defendant was charged with four counts of committing a lewd act on a child under the age of 14 years. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 386.) The court found evidence of the defendant's prior misconduct was relevant "because the similarity between the circumstances of the prior acts and the charged offenses supports the inference that

---

the defendant. In contrast, in subdivision (b)(1) of section 500, the common scheme or plan is evaluated based on customer *receipts.*

[11] For example, our Supreme Court in *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] used the words "same design or plan" when discussing whether the circumstances of the prior uncharged acts were sufficiently similar to the charged offense to admit the prior uncharged acts to support the inference that the defendant committed the charged offense. (*Id.* at p. 393.) The court also used the words "common design or plan" in its analysis of this issue. (*Id.* at p. 394.) As we discuss *post,* that our Supreme Court in *People v. Ewoldt* used these words and "common scheme or plan" interchangeably supports the conclusion the words "common scheme or plan" in subdivision (b) of section 12022.6 have an ordinary, nontechnical meaning.

[12] Although Evidence Code section 1101 was amended after the court's decision in *People v. Ewoldt,* those amendments have no bearing on our analysis in the present case. Subdivision (a) of section 1101 provides that evidence of a person's character or a trait of his or her character is inadmissible when offered to prove his or her conduct on a specified occasion. However, subdivision (b) of Evidence Code section 1101 clarifies that subdivision (a) does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

defendant committed the charged offenses pursuant to the *same design or plan* defendant used to commit the uncharged misconduct." (*Id.* at p. 393, italics added.)

In reaching its conclusion, the court noted the " 'presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.' [Citation.] For example, a letter written by the defendant stating he planned to commit a certain offense would be relevant evidence in a subsequent prosecution of the defendant for committing that offense. [Citation.] The existence of such a design or plan also may be proved circumstantially by evidence that the defendant has performed acts having 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.]" (*People v. Ewoldt, supra,* 7 Cal.4th at pp. 393–394.)

Although *People v. Ewoldt, supra,* 7 Cal.4th 380 was decided two years after section 12022.6 was amended to add the words "common scheme or plan," the opinion is instructive on our issue because it thoroughly analyzes the law regarding the admissibility of prior act evidence which predates the 1992 amendment of section 12022.6. (See *Ewoldt,* at pp. 394–403, citing and discussing among other cases: *People v. Lisenba* (1939) 14 Cal.2d 403, 427–428 [94 P.2d 569] ["This court held that evidence of the defendant's prior misconduct was admissible to establish a *common design or plan* to murder his wives for financial gain." (*Ewoldt,* at p. 395, italics added)], *People v. Ing* (1967) 65 Cal.2d 603, 612 [55 Cal.Rptr. 902, 422 P.2d 590] [The testimony of two former patients of defendant, a physician, who like the victim consulted with defendant to determine whether they were pregnant only to be raped by defendant after he administered an injection that made them feel dizzy and/or lose consciousness, was ruled admissible by our Supreme Court because " '[i]n view of the striking similarities between the other offenses and the ones charged[,] the evidence was relevant on the question of a *common scheme or plan* to commit rape . . . .' " (*Ewoldt,* at p. 396, italics added)], *People v. Sam* (1969) 71 Cal.2d 194, 199, 205 [77 Cal.Rptr. 804, 454 P.2d 700] [trial court improperly admitted evidence of uncharged misconduct to establish a "common design or plan," inasmuch as defendant's conviction of murder was based upon evidence defendant, during an altercation with the victim, " 'stomped his foot into the [victim's] stomach' " (*Ewoldt,* at pp. 396–397) and evidence was admitted indicating defendant, during a drunken quarrel, previously kicked his former girlfriend in the ribs, resulting in her hospitalization, and on another occasion defendant kicked yet another person during an altercation], and *People v. Archerd* (1970) 3 Cal.3d 615, 620 [91 Cal.Rptr. 397, 477 P.2d 421] [evidence defendant used a lethal dose of insulin to murder a third wife, the ex-husband of another wife and a friend "was admissible 'to show a *common plan or scheme*' " in the

murder trial of defendant accused of killing two of his wives and a nephew by the same unusual means (*Ewoldt*, at p. 397, italics added)].)

The court in *People v. Ewoldt* next discussed its decision in *People v. Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1], which it described as a departure "from its previous approach to the question of the admissibility of uncharged criminal acts to demonstrate a *common design or plan.*" (*People v. Ewoldt, supra*, 7 Cal.4th at p. 398, italics added.) "The victim in *Tassell* was a waitress employed in a restaurant in which the defendant was a customer. When the restaurant closed at 1:30 a.m., the victim agreed to give the defendant a ride home in her van. The victim testified that when they reached the defendant's destination, he attempted to kiss her and, when she resisted, grabbed her by the neck and threw her into the rear of the van, where he later raped her and forced her to orally copulate him.

"Evidence was introduced indicating that, four years earlier, the defendant had engaged in a similar attack upon a barmaid after she left her employment at a bar in which the defendant was a customer. When the bar closed, the defendant followed the victim to her automobile and attempted to kiss her as she started the engine. When she resisted, he forced his way into the vehicle and grabbed her neck as he drove to a secluded spot. When they arrived, the defendant forced the victim to orally copulate him, forcibly engaged in anal intercourse with the victim, and raped her.

"Additional evidence was introduced indicating that on a night three years prior to the commission of the charged offense, the defendant picked up a female hitchhiker, pulled off the road, and attempted to kiss her. When she resisted, he grabbed her by the throat and forced her to orally copulate him, unsuccessfully attempted anal intercourse, and raped the victim.

"This court held evidence of the defendant's prior criminal acts was inadmissible to establish a common design or plan. Unlike the cases discussed above in which this court determined whether the similarities between the uncharged misconduct and the charged offense were sufficient to demonstrate the existence of a common design, *Tassell* promulgated a new rule that evidence of uncharged misconduct could be used to demonstrate a common design or plan only 'where it is claimed that there is, in truth, a "single conception or plot" of which the charged and uncharged crimes are individual manifestations. [Citation.] Absent such a "grand design," talk of "common plan or scheme" is really nothing but the bestowing of a respectable label on a disreputable basis for admissibility—the defendant's disposition.' [Citation.] The decision went on to explain: 'No rational argument would support a contention that the three sets of sex crimes were part of one larger plan. There being no issue of identity, it is immaterial whether the modus operandi

of the charged crime was similar to that of the uncharged offenses. While the People rely on the "common plan or scheme" rationale for admissibility, under the circumstances that is merely a euphemism for "disposition." ' [Citation.]" (*People v. Ewoldt, supra,* 7 Cal.4th at pp. 398–399.)

Our Supreme Court in *People v. Ewoldt* concluded its decision in *People v. Tassell* was "based upon the erroneous premise that a common design or plan cannot be established by evidence reflecting that the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances, unless all of these acts are part of a single, continuing conception or plot. As this court recognized in *People* v. *Lisenba, supra,* 14 Cal.2d 403, however, evidence that the defendant, on two separate occasions, married the victim, obtained insurance on her life, and then drowned her in a manner calculated to make it appear that her death was accidental, was admissible to demonstrate that both crimes were committed pursuant to a common design, despite the fact that there was nothing to indicate that the defendant had formed a single, continuing plot to kill both of his wives. Contrary to its holding in *Tassell,* this court in *Lisenba* and its progeny held that it is relevant that the modus operandi of uncharged offenses committed by a defendant is markedly similar to the charged offense, even when the evidence is admitted not to prove identity or intent, but to establish that the uncharged offenses and the charged offense are manifestations of a common design or plan. [Citations.] The decision in *Tassell* failed to recognize that evidence of similar, uncharged misconduct may be used not only to prove intent or identity, but also to show a common design or plan. As we have explained, evidence of a common design or plan is admitted not to prove the defendant's intent or identity, but to prove that the defendant engaged in the conduct alleged to constitute the charged offense. [Citation.] Such evidence, therefore, is not admitted to establish that the defendant has a criminal disposition or bad character, but to prove that he or she committed the charged offense pursuant to the same design or plan used in committing the uncharged criminal acts." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 399.)

"In light of their anomalous position in more than 50 years of California case law" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 401), the court overruled *People v. Tassell, supra,* 36 Cal.3d 77, and another case, "to the extent they hold that evidence of a defendant's uncharged similar misconduct is admissible to establish a common design or plan only where the charged and uncharged acts are part of a single, continuing conception or plot. We hold instead that evidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*People v. Ewoldt, supra,* 7 Cal.4th at pp. 401–402, fn. omitted.)

The court in *People v. Ewoldt* next articulated the test to determine whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.) The court noted the "nature and degree of similarity (between uncharged misconduct and the charged offense) required in order to establish a common design or plan [varied] from the degree of similarity necessary to prove intent or identity," among other things. (*Ibid.*, fn. omitted.)

The court in *People v. Ewoldt* determined the "least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal,. i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.)

Of significance for our purposes, the court in *People v. Ewoldt* stated a "greater degree of similarity is required [(than for intent)] in order to prove the existence of a common design or plan. As noted above, in establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] '[T]he difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity.' [Citations.]" (*People v. Ewoldt, supra*, 7 Cal.4th at pp. 402–403.)

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. For example, evidence that a search of the residence of a person suspected of rape produced a written plan to invite the victim to his residence and, once alone, to force her to engage in sexual intercourse would be highly relevant even if the plan lacked originality. In the same manner, evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design

or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403.)

Finally, the court in *People v. Ewoldt, supra,* 7 Cal.4th at page 403, concluded the "greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]"

The court in *People v. Ewoldt* turned to the facts before it and compared the nature and degree of similarity between the uncharged lewd act on the defendant's older stepdaughter (Natalie) and the charged offense on his younger stepdaughter (Jennifer): "In the present case, the victims of both the uncharged misconduct and the charged offenses were defendant's stepdaughters, who were residing in defendant's home, and the acts occurred when the victims were of a similar age. On three occasions, defendant molested Natalie at night while she was asleep in her bed. When discovered, defendant asserted he was only 'straightening up the covers.' In two of the charged offenses, defendant molested Jennifer in an almost identical fashion and, when discovered, proffered a similar excuse. On one occasion prior to the commission of the charged offenses, defendant touched either Jennifer's breasts or her vaginal area. This marked the beginning of an ongoing pattern of molesting Jennifer. We conclude, therefore, that evidence of defendant's uncharged misconduct shares sufficient common features with the charged offenses to support the inference that both the uncharged misconduct and the charged offenses are manifestations of a common design or plan. Such evidence is relevant to establish that defendant committed the charged offenses in accordance with that plan." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 403.)

### 4. *Legislative History*

Because subdivision (b) of section 12022.6 is not ambiguous on its face, we typically presume that the Legislature meant what it said and we do not resort to legislative history to construe the statute. (See *People v. Talhelm* (2000) 85 Cal.App.4th 400, 407 [102 Cal.Rptr.2d 150]; see also *People v. Patterson* (1999) 72 Cal.App.4th 438, 442 [84 Cal.Rptr.2d 870].) Nevertheless, out of an abundance of caution (see *Fairbanks v. Superior Court* (2009)

46 Cal.4th 56, 61 [92 Cal.Rptr.3d 279, 205 P.3d 201] [although the statutory language was unambiguous and there was no need to consider the statute's legislative history, the court nonetheless reviewed the legislative history "from an abundance of caution"]) we reviewed the legislative history of the amendment to section 12022.6 when the words "common scheme or plan" were added to that statute. We also asked the parties to submit supplemental briefing analyzing that history and its application, if any, to the instant case, which we have read and considered in reaching our decision.[13]

The legislative history is silent on the meaning of these words. That silence does, however, provide some guidance on our issue, which we discuss *post*.

### D. *Analysis*

We conclude the words "common scheme or plan" in subdivision (b) of section 12022.6 do not have a technical meaning, but rather are understood to have a plain, ordinary meaning these words commonly convey. If the Legislature had intended otherwise, it undoubtedly would have expressed that intent in the statute, in the legislative history of the amendment to the statute or in at least one of the related "network of statutes" that use the exact same words. That these and similar words also were the subject of a long line of prior bad act cases decided by our Supreme Court before the 1992 amendment to section 12022 provides further support for our conclusion that if the Legislature intended the words "common scheme or plan" to have a technical, legal meaning it would have expressed that intent.[14]

---

[13] In connection with their supplemental brief, we grant the People's unopposed request that we take judicial notice of legislative documents attached to their supplemental brief. (See Evid. Code, §§ 452, subd. (c), 459.)

[14] Cases continue to rely on the definition of "common scheme or plan" or words to that effect articulated in *People v. Ewoldt* in determining whether evidence of a defendant's prior acts is admissible for a reason other than to show disposition or character. (See, e.g., *People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329 [117 Cal.Rptr.3d 658, 242 P.3d 105] [relying on *People v. Ewoldt* in concluding evidence of two prior robberies and attacks was sufficiently similar to the charged offense to be admissible to prove intent and a "common plan" in the charged offense]; *People v. Davis* (2009) 46 Cal.4th 539, 602–603 [94 Cal.Rptr.3d 322, 208 P.3d 78] [relying on *People v. Ewoldt* in concluding prior crimes evidence was sufficiently similar to provide evidence of a "common scheme or plan" inasmuch as defendant in the prior crimes "abducted a stranger, a female; used a weapon; assured the victim that he would not harm her; took her to a remote location; and carried bindings with him, indicating that the behavior was planned"]; *People v. Kraft* (2000) 23 Cal.4th 978, 1030–1031 [99 Cal.Rptr.2d 1, 5 P.3d 68] [relying on *People v. Ewoldt* in concluding there was sufficient similarity between the 16 charged murder counts to establish a "common scheme or plan" and thus support the trial court's decision refusing to sever the 16 murder counts because the evidence was "cross-admissible"].)

In addition, although section 12022.6 was amended to include the words "common scheme or plan" *before People v. Ewoldt* was decided, the Legislature's addition of these same words in amendments to section 186.10 and Welfare and Institutions Code section 10980 occurred *after People v. Ewoldt* was handed down by our Supreme Court. (See Stats. 1994, ch. 1187, § 2, p. 7167 [§ 186.10]; Stats. 1998, ch. 903, § 2.5, p. 5955 [Welf. & Inst. Code, § 10980].) As noted, we presume the Legislature was aware of existing laws and judicial decisions, including the landmark case of *People v. Ewoldt*, when it added the words "common scheme or plan" in the amendments to these related statutes.

We thus graft the definition of "common scheme or plan" pronounced in *People v. Ewoldt* into subdivision (b) of section 12022.6.[15] To prove "common scheme or plan" for purposes of this statute, we compare the *losses* from counts 1 and 2 and determine whether there are a " 'concurrence of common features that the various [losses] are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.) Further, the "common features" "must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403.)

The People contend that although the crimes in counts 1 and 2 were perpetrated in "different ways," they nonetheless were part of the "same overall plan to steal from the organizations in which [Green] enjoyed a position of trust and, in particular, power over the organizations' funds." The People also contend the fact that the two crimes "occurred during the same general period of 2003 and 2004" supports the finding of the jury that Green's embezzlement efforts were "not random or spontaneous, but part of a coordinated common plan or scheme to defraud those entities in which she was in a position to be able to defraud." (Fn. omitted.)

---

[15] In reaching this conclusion, we recognize there are substantial differences in the purposes and policies served by the rules governing the admissibility of prior bad acts evidence (e.g., as developed by case law and Evid. Code, § 1101) on the one hand, and the imposition of a term enhancement by aggregating losses (e.g., § 12022.6, subd. (b)), on the other hand. Broadly speaking, as we have noted the purpose of Evidence Code section 1101 is to prohibit the admission of certain evidence except under limited exceptions. By contrast, the purpose of section 12022.6 is to deter large-scale crime. (*People v. Bowman, supra*, 210 Cal.App.3d at p. 447; see also Sen. Com. on Judiciary, Rep. on Assem. Bill No. 939 (1991–1992 Reg. Sess.) p. 2 [the amendment to § 12022.6 allowing losses to be aggregated if they arise from a "common scheme or plan" is intended to deter criminal conduct by white-collar criminals].) Those differences aside, we have no authority to rewrite a statute to conform to a meaning that varies from that which is expressed. (*People v. Smith* (2007) 150 Cal.App.4th 89, 94 [57 Cal.Rptr.3d 926]; *People v. Harris* (2006) 145 Cal.App.4th 1456, 1465 [52 Cal.Rptr.3d 577].)

■ That Green was the embezzler in both offenses, that she misused the trust placed in her by her victims and that both crimes took place during the same general timeframe is insufficient to support the jury's finding the losses in counts 1 and 2 arose from a "common scheme or plan" for purposes of subdivision (b) of section 12022.6.

Focusing on count 1, Green's plan was simple. She took control of the HOA books and records in her capacity as HOA president, forged the signatures of other board members on checks drawn from the HOA bank account and used that money to pay her own expenses.

In count 2, Green's plan was anything but simple. As office manager and secretary, Green used her position to manipulate customer invoices, underreport the amount of cash generated by D&L and delay the deposit of customer checks to offset the money she took.

What's more, Green also stole from the business by paying out cash for fake transactions allegedly made on behalf of the business and by cashing checks payable to the business (e.g., the refund check for $2,943 issued by a workers' compensation insurer). When confronted by the owners of D&L, Green denied any wrongdoing and maintained her innocence throughout trial.

Thus, the evidence in the record shows it was proper to aggregate all the losses in count 1, based on Green's general plan of forging the signatures of other board members on a series of checks drawn from the HOA bank account. Similarly, the evidence shows it also was proper to aggregate all the losses in count 2, based on Green's sophisticated plan of freeing up cash from the business by underreporting the amount of money earned by the business and purposely waiting to deposit customer checks to offset the cash she was taking.

However, in comparing the losses in count 1 to the losses in count 2, the lack of common features between them shows no general, overarching plan. Indeed, the two victims in counts 1 and 2 were not connected; the crimes were not intertwined; the methods of theft Green used to commit each crime were dissimilar; and the schemes to defraud were separate and distinct and not contingent on each other. We thus agree with Green there is insufficient evidence in the record to support the jury's finding the losses in counts 1 and 2 arose from a "common scheme or plan" as we have defined those words in this opinion.

## DISPOSITION

The imposition of the one-year sentence enhancement under subdivision (a) of section 12022.6 is reversed based on the lack of evidence in the record to support the finding the losses in counts 1 and 2 arose from a "common scheme or plan" for purposes of subdivision (b) of section 12022.6. In all other respects, the judgment of conviction is affirmed.

McIntyre, J., and Aaron, J., concurred.